Dennis J. Stewart, CA Bar No. 99152
**GUSTAFSON GLUEK, PLLC**
600 B Street, Suite 1700
San Diego, CA 92024
Tel.: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dstewart@gustafsongluek.com
dgoodwin@gustafsongluek.com
mnikolai@gustafsongluek.com

Attorney for Plaintiff and Others Similarly Situated

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN CASTORINA, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>   vs.<br><br>BANK OF AMERICA, N.A., and INTEGON NATIONAL INSURANCE COMPANY,<br><br>        Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br>**(1) Breach of Contract;**<br>**(2) Breach of the Implied Covenant of Good Faith and Fair Dealing;**<br>**(3) Violation the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq*;**<br>**(4) Violation of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq*;**<br>**(5) Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, et seq;**<br>**(6) Violation of California's Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788, *et seq*;**<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff, JOHN CASTORINA (hereinafter referred to as "Castorina" or "Plaintiff"), by and through his undersigned counsel, brings this class action lawsuit against Defendants BANK OF AMERICA, N.A. ("BOA") and INTEGON NATIONAL INSURANCE COMPANY ("Integon") (collectively, "Defendants"), and alleges the following:

# I.

## **NATURE OF THE ACTION**

1.      This is a putative class action brought under Rule 23 of the Federal Rules of Civil Procedure to redress the unfair and deceptive practices committed by BOA in connection with its home mortgage loan servicing business.  BOA services home loans according to uniform practices designed to maximize fees assessed on borrowers' accounts when they are behind on their payments. Consistent with these practices, BOA uses an automated default servicing platform to illegally, unfairly, and fraudulently charge defaulted or at-risk-of-default borrowers for multiple and repetitive "property inspections" that are not required by lenders, not permitted by lender guidelines, and in many cases not allowed under state and federal regulations and guidelines.

2.      In addition, this class action seeks to recover fees improperly charged by BOA to homeowners with mortgages serviced by BOA for unnecessary expenses and/or unprovided services, which are in some cases outright fraudulent and in all cases excessive, deceptive, and otherwise unfair. These fees, such as forced placed flood insurance, are added onto the mortgage payoff amount a homeowner must pay to BOA to satisfy the lien on their property and otherwise avoid foreclosure. The fees are intentionally disguised as being for necessary or otherwise reasonable expenses to deceive homeowners, in furtherance of a scheme to generate unnecessary and improper fees, and otherwise enrich BOA at the expense of homeowners.  In addition, with the willing assistance of Integon, BOA force places insurance at unconscionably high rates, well above market rates, with no added benefit to the insured. Integon is a wholly owned subsidiary of National General Holding Company and provides forced-placed insurance policies for the loans owned and serviced by BOA through an exclusive agreement.

3. Moreover, the acts of BOA as servicer of the loans at issue affecting Plaintiff and the Class Members, result in a regular pattern of violating the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"), with respect to the forced place insurance practices and information provided about the appropriateness and need of default related property inspection.

4. Plaintiff also alleges that BOA's practices are misleading, deceptive, and unfair under state laws including, without limitation, California's Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788, *et seq.* and California's Unfair Competition Law, Cal. Bus. And Pro. Code § 17200, *et seq.*

5. Plaintiff and the Class Members are homeowners whose homes have been in default or foreclosure. BOA is both lender and servicer of the mortgage loans which encumber Plaintiff's and Class Members' homes. As both a lender and a servicer, BOA regularly acts as a debt collector.

6. All conditions precedent to the filing of this action have been waived and/or satisfied.

## II.

## THE PARTIES

7. Plaintiff Castorina is an individual citizen of the State of California, residing in Sacramento County. At all times material, has owned and occupied the property at issue since 1995, located at 2110 Forestlake Drive, Rancho Cordova, California 95670 (the "Property").

8. Defendant, BOA is a is a national banking association with its principal place of business in North Carolina. It is a federally chartered bank headquartered in Charlotte, North Carolina. Through its network of branch locations, BOA conducts substantial business in the State of California and this District.

9.      Defendant Integon is a property and casualty insurance company with its principal place of business in North Carolina.  Integon conducts substantial business in the State of California and this District.

## III.

## JURISDICTION AND VENUE

10.     This Court has general diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity between the Plaintiff and Defendant. This Court also has jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§1332(d). CAFA's requirements are satisfied in that (1) the members of the Class exceed 100; (2) the citizenship of at least one proposed Class member is different from that of the Defendant; and (3) the matter in controversy, after aggregating the claims of the proposed Class members, exceeds $5,000,000.00, exclusive of interest and costs.

11.     The Court has subject matter jurisdiction under 28 U.S.C. § 1331 based upon the federal TILA claims under 15 U.S.C.§ 1601, *et seq*., and the Fair Debt Collection Practices Act ("FDCPA") claims under 15 U.S.C. § 1692, *et seq*.  The Court also has supplemental jurisdiction over the California's Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788, *et seq*. and California's Unfair Competition Law, Cal. Bus. And Pro. Code § 17200, *et seq.* claims under 28 U.S.C. § 1367, because these claims are so related to the federal FDCPA claims that they form part of the same case or controversy under Article III of the United States Constitution.

12.     Venue is proper in the United States District Court in and for the Eastern District of California pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this district.

# IV.

## GENERAL BACKGROUND

I.     **Mortgages Contain Largely Uniform Obligations and Requirements for Loan Servicers**

13.     Virtually all mortgage loans originated in the United States use either the standardized Fannie Mae/Freddie Mac Security Instrument (the "Fannie/Freddie Mortgage") or the Federal Housing Authority ("FHA") Deed of Trust. This is because at origination, the originating bank/lender must use these forms to have the possibility of selling the mortgage to Fannie/Freddie, which are the largest holders of mortgages in the United States. If the standardized forms are not used, Fannie/Freddie will not purchase the loan from the originator.

14.     While the Fannie/Freddie forms are not identical for each state, they contain sections which are uniform and do not change from state to state. Importantly, the sections of Fannie/Freddie mortgages at issue in this case are the sections that are uniform on a nationwide basis.

15.     Likewise, the FHA Mortgage forms have sections that can vary based on the state in which the property is located, but the sections at issue in this case are the same in every state.

16.     When the mortgage loan is sold in the secondary market, for example to Fannie/Freddie, or to private investors through a Mortgage-Backed Security ("MBS"), the Servicing Rights are separated from the principal and interest income stream rights, and the Servicing Rights are either retained by the originating lender or acquired by a third-party loan servicer. A Fannie Mortgage clarifies the distinction between the "Lender" and the "Loan Servicer." The "Lender" is the originating Lender who provides the funds to the Borrower in return for repayment plus interest, i.e., the owner of the note. The Loan Servicer need not be the mortgage originator, but as explained below, the Loan Servicer provides specific circumscribed services in exchange for statutorily regulated fees.

17.   Importantly, the Fannie Mortgage draws an additional sharp distinction between the "Lender" and the "Loan Servicer." Specifically, the "Lender" funds the loan and is entitled to repayment of principal and interest. The "Loan Servicer" "collects Periodic Payments due under the Note and … Security Instrument and performs other mortgage loan servicing obligations …"

18.   The Loan Servicer's duties and obligations are clearly filled in and defined by the Fannie Mae or Freddie Mac written Seller/Servicer Guidelines (the "Guidelines") when the loan is either serviced by the lender itself or sold to third-party servicer entities.

19.   The loans at issue affecting the Plaintiff and the Class Members are serviced by BOA, acting as both the Lender and the Loan Servicer; therefore, BOA is required to comply with all servicing guidelines.

### A.   Effect of a Borrower's Default and BOA's Source of Extra Fees

20.   As explained more fully below, BOA in its role as Loan Servicer, has an economic incentive to push borrowers into default, an interest that is misaligned with borrowers and BOA's role as Lender.

21.   In the ordinary course, in the event of a default by the borrower, the Government Sponsored Enterprise/Mortgage-owner (i.e., the Lender) suffers the principal loss. However, since the loan in this instance is securitized, the Lender, BOA, has shifted its risk to the investors and in fact profits on the securitization transaction. Furthermore, if the Loan Servicer advanced payments on taxes, insurance premiums or other default/foreclosure related costs (including, without limitation, property inspections), the Loan Servicer does not suffer a loss of those advances in the event of foreclosure. Rather, the Lender reimburses the Loan Servicer for the outstanding amount.

22.   In this instance since BOA is both the Lender and the Loan Servicer it does not reimburse itself for the advances. However, Fannie Mae/Freddie Mac and HUD as insurers of a loan

*do* reimburse BOA for all the property inspections and any other default related services, including but not limited to, fees for advances from a loan's escrow account, such as property taxes and insurance payments.

23.     The Loan Servicer's risk of loss in the event of a borrower's default and foreclosure is limited to a loss of the right to receive future servicing fees on the loan. In the event of default and foreclosure, Loan Servicers also stand to collect additional fee income including late fees, attorney fees, foreclosure fees, etc., that exceed the value of the servicing fees paid. If the Loan Servicer manages to work with the borrower to modify or refinance the delinquent loan, the Loan Servicer typically receives a fee (i.e., from the U.S. Treasury) in connection with that outcome as well.

24.     The potential loss of base servicing fees can pale in comparison to the ancillary fee compensation received by the Loan Servicer in connection with default servicing activities. Indeed, where the compensation received in connection with default servicing activities is greater than the present value of servicing fees—as is often the case—the Loan Servicer has a greater interest in forcing borrowers into (and ensuring they stay in) default than it has in granting a modification or restoring the account to a fully performing loan.

25.      BOA earns revenue from mortgage loan servicing in three principal ways. First, BOA receives a fixed fee for each loan which is determined by the servicing agreements between BOA and the investors or note holders.

26.     Second, BOA earns "float" income from accrued interest between when consumers pay and when those funds are remitted to Lenders, taxing authorities, insurers, and other relevant parties.

27.     Third, BOA receives ancillary fee income that includes, without limitation, late charges paid by borrowers, workout and modification incentive fees, and other delinquency-related fee income including, for example, the property inspection or "home preservation" fees at issue here.

28.     Two important sources of ancillary fee income for BOA are property inspection fees, and late fees. As described more fully herein, each time BOA inspects the property and assesses a property inspection fee on a borrower, the borrower must pay an additional $17.50 (the amount BOA presently charges) to become current. If the borrower fails to become current, BOA imposes additional late fees on the borrower.

29.     This practice makes it more difficult for distressed borrowers to become current and leads many borrowers into foreclosure proceedings and/or to modify their loan. As explained above, this serves BOA's interests. Because Loan Servicers like BOA can generate more revenue from loan servicing activities and fees then from principal and interest payments made by borrowers, Loan Servicers have a vested interest in generating revenue through so-called default servicing activities and corresponding ancillary fees.

30.     Some of these fees, such as late fees, are pure profit for the Loan Servicer. Other fees permit the Loan Servicer to generate additional income by delegating the task to an affiliated entity or entity that returns a profit to the Loan Servicer.

31.     Furthermore, because BOA is able to generate more loan servicing income through default servicing activities as compared to ensuring that borrowers make timely payments on the mortgage to the benefit of the owner/investor of the loan, BOA is incentivized to keep borrowers in default, which is contrary to the interests of borrowers. Indeed, according to one member of the Board of Governors of the Federal Reserve System, "a foreclosure almost always costs the investor [of the loan] money, but [it] may actually earn money for the servicer in the form of fees."[1]

---

[1] Governor Sarah Bloom Raskin, "Problems in the Mortgage Servicing Industry," Board. of Governors of the Federal Reserve System (Nov. 12, 2010), *available*: http://www.federalreserve.gov/newsevents/speech/raskin20101112a.htm.

32.     One template for determining the reasonableness of the tasks and charges undertaken by the Loan Servicer are the guidelines, rules and/or regulations issued by the Lender that set forth the Loan Servicer's obligations with respect to the specific tasks at issue. None of these documents suggest that it is appropriate to inspect a property more than once during a 30-day period, if at all, or after the borrower has come current.  Rather, it is BOA's unilateral and self-serving determination *en masse* that conducting these excessive property inspections is "appropriate" regardless of the borrower's underlying circumstances or any objective criterion related to the circumstances surrounding particular loans.

33.     In addition, when a borrower, as determined by BOA, does not have sufficient hazard and/or flood insurance to cover the property secured by the loan it is servicing, BOA has the power - and exerts that power - to force borrowers to pay for the excessive, unnecessary and unauthorized forced-placed insurance at exorbitant premiums.  BOA can simply withdraw the amounts from borrowers' escrow accounts, add the amounts to the loan balance, and ultimately foreclose on the property should the borrower fail to pay the inflated force-placed premiums. When BOA force-places one of these excessively-priced, unwarranted insurance policies and assesses the cost on the borrower through these methods, it can lead to the imposition of various fees in addition to the force-placed premiums, including late fees, while also creating a negative credit reporting situation for the borrower and may ultimately lead to loan modification or foreclosure, which creates for BOA the opportunity to generate even more servicer fee income.

34.     Moreover, BOA profits from servicing loans by extracting additional payments for themselves or their affiliates, that are over and above the principal and interest payments that they receive for servicing the loan. Since servicers are already paid for servicing, these kickbacks or "commissions" paid to servicers and their affiliates on force-placed insurance are pure profit.

35.     There is no reasonable or good faith explanation for BOA to profit from these kickbacks received in connection with force-placed insurance.

36.     Given this conflict of interest with the borrowers, even though the loan servicing and default servicing tasks performed by BOA are purportedly to protect their interests as Lender, the fees charged for these services are excessive and in violation of the mortgage agreement, servicing guidelines and applicable laws.

## II.     Property Inspections on Defaulted Loans

37.     Loan Servicers perform "servicing" tasks on behalf of the Lender that holds the loan. In some instances, the Loan Servicer and Lender are one and the same, as is the case here.

38.     The tasks a Loan Servicer performs include collecting monthly payments, monitoring insurance coverages, and ensuring that taxes are paid. Loan Servicers are also responsible for taking action to protect the properties securing loans when certain triggering circumstances arise, e.g., obtaining lender-placed insurance when the Loan Servicer determines that the property is uninsured and/or securing a property that has been abandoned to avoid damage to that property.

### A.     Servicing Guidelines by Owner/Investor Control Appropriate Loan Servicing Activities

39.     The tasks Loan Servicers perform, and the standards Loan Servicers are supposed to adhere to in performing these tasks are determined by owner/investor guidelines. For example, Fannie Mae, Freddie Mac and HUD each issue written servicing guides that delineate the tasks that Loan Servicers must perform, and standards applied in evaluating Loan Servicer performance. Failure to comply with these guidelines is probative of a failure on the part of the servicer to comply with state consumer protection laws. *See Davidson v. Seterus, Inc.*, 21 Cal. App. 5th 283, 289, 230

Cal. Rptr. 3d 441, 443 (2018). Loan Servicers are also bound by the terms of the mortgage contracts and applicable laws and regulations.

40.     The provisions of the Fannie Mae and Freddie Mac Guidelines referencing property inspections do not require or suggest that Loan Servicers order property inspections more frequently than once every 30 days, nor do they authorize inspections after the borrower has remedied their default/come current on their loan.

41.     For example, Section D2-2-10 of the 2021 Fannie Mae Servicing Guidelines, Fannie states:

> The servicer must order the initial property inspection on or after the 60th day of delinquency and complete the property inspection no later than the 75th day of delinquency for all delinquent mortgage loans. The following table outlines the servicer's responsibilities for initiating and continuing property inspections on a property securing a delinquent mortgage loan.
>
> The servicer must complete [a] property inspection every calendar month as long as the mortgage loan remains 60 or more days delinquent **unless the property is borrower occupied** and one of the following has occurred:
>
> • QRPC [Quality Right Party Contact] has been established within the last 30 days,
> • a full payment has been received within the last 30 days,
> • a repayment plan or a Trial Period Plan has been approved and the borrower is performing the plan, or
> • the borrower is performing under the applicable bankruptcy plan.[2]

42.     This provision is necessary to ensure the property is occupied when the Loan Servicer has been *unable to establish contact with the borrower* and loan payments have not been received. Plainly, the provision does not authorize or permit inspections when the Loan Servicer is in contact with the borrower and knows the property to be inhabited, or after the borrower has come current.

43.     The Fannie Mae Guidelines also does not authorize or permit inspections when the Loan Servicer is in contact with the borrower and knows the property to be inhabited.

---

[2] https://servicing-guide.fanniemae.com/ (emphasis added) published October 13, 2021.

44.     Similarly, when an FHA mortgage has become delinquent, HUD's guidelines require that the lender attempt to contact the borrower to ascertain whether the property has become vacant or abandoned. Only when such efforts have proved unsuccessful, the lender is authorized to perform an initial inspection of the property.[3]

45.     However, where a property subject to a delinquent FHA mortgage is shown to be occupied by the mortgagor or other authorized persons, HUD's guidelines authorize the lender to conduct subsequent inspections provided that within the previous 30 days, each of the following conditions is met: (i) there have been no mortgage payments; (ii) upon attempting to contact the mortgagor by telephone or letter, the lender has been unable to determine occupancy status; (iii) there is an increased risk of abandonment of the property.[4]

46.     Plaintiff had either been in contact with BOA and achieved QRPC under the Fannie Mae and/or HUD Servicing Guidelines. Yet, BOA continued ordering property inspections *well after* they knew that a QRPC with Plaintiff was established.

47.     As further detailed below, despite having direct evidence that the property was continually occupied by Plaintiff, the borrower, and not at risk of being damaged or neglected, BOA continued ordering and charging for unnecessary and illegal property inspections.

48.     Fannie Mae and Freddie Mac have not taken action to prevent BOA's violations of the guidelines because they rely on Loan Servicers to police themselves. As explained by the Federal Housing Finance Agency ("FHFA"), the conservator of Fannie Mae and Freddie Mac:

> [Fannie Mae and Freddie Mac] use a delegated business model to buy and service mortgage loans. In this model, they contract with third-party mortgage loan sellers and/or servicers (e.g., counterparties, such as banks) that are relied on to comply with their requirements for ... servicing the ... loans [purchased or guaranteed by Fannie Mae or Freddie Mac] (e.g., collecting payments); and [] reporting data about the loans. As a result of relying on the

---

[3] HUD Handbook [revised], 4330.1, Chap. 9, Sec. 9-9, Subsection A, paragraph a, pages 21-22.
[4] HUD Handbook [rev.], 4330.1, Chap. 9, Sec. 9-9, Subsection A, paragraph b, page 22.

counterparties for compliance and reporting, [Fannie Mae and Freddie Mac] run the risk of their counterparties failing to meet their respective ... servicing guidelines.[5]

49.     The Office of Inspector General for the FHFA then wrote:

In the mid-1990s, one of the Enterprises required an independent, third-party assurance of counterparties' compliance with some elements of its guidelines, but this requirement was *replaced by reliance on counterparties' self-representations of their compliance*. Further, the Enterprises have risk-based, internal oversight of their counterparties' compliance with selling and servicing guidelines *but most receive no onsite review*.[6]

50.     The OIG of the FHFA has also previously found that Fannie Mae and Freddie Mac "do not ensure counterparties' business practices follow all federal and state laws and regulations designed to protect consumers from unlawful activities."[7]  "In addition, OIG identified that [Fannie Mae and Freddie Mac] do not have a formal monitoring program in place to review their counterparties' compliance with the federal and state laws that govern servicing mortgage loans. Instead, [Fannie Mae and Freddie Mac] rely primarily on counterparty self-certifications of contractual compliance along with federal regulators' supervisory and enforcement activities."[8]

51.     Additionally, the OIG of the FHFA determined that the Loan Servicers and the inspectors they used  routinely charged borrowers for inspections that never took place due to the properties being in a gated community, and that these "inspections" provided no useful information:

---

[5] Letter from Russell A. Rau, Deputy Inspector General for Audits of the FHFA, to Nina Nichols, Deputy Director for Enterprise Regulation, Audit of FHFA's Oversight of Risks Associated with the Enterprises Relying on Counterparties to Comply with Selling and Servicing Guidelines (Sept. 26, 2014) ("Counterparty Risk Letter"), at 1, *available* at https://www.fhfaoig.gov/Content/Files/AUD-2014-018.pdf (last visited April 19, 2021).
[6] Counterparty Risk Letter (emphasis added), at 1.
[7] Counterparty Risk Letter, at 11.
[8] *Id. See* also FHFA OIG, *FHFA Should Develop and Implement a Risk-Based Plan to Monitor Oversight of Their Counterparties Compliance with Contractual Requirements Including Consumer Protection Laws* (Mar. 26, 2013), available at http://www. Fhaoig.gov/Content/Files/Aud-2013-008; Letter from Steve A. Linick, Inspector General of FHA to Edward J. DeMarco, Director, Systemic Implication Report: Oversight of Property Preservation Inspections (Nov. 26, 2012), *available* at https://www.fhfaoig.gov/sites/default/files/SIR%20FINAL%20Enterprise%20Oversight%20of%20Property%20Preservation_0.pdf (uncovering fraud by property inspection vendor and questioning whether Fannie Mae and Freddie Mac had sufficient protections in place to detect fraud).

OIG found that inspectors conducted unnecessary inspections that did not report useful information to the servicer. In one case, the inspector conducted inspections of a property in a gated community—closed to the public. For 12 consecutive months, the inspector did not obtain access to the restricted property and billed the servicer for 12 property inspections conducted from outside the gated community. None of these inspection reports contained useful information—e.g., occupancy and security status, condition, and description—which prevented the servicer from properly monitoring the status of the delinquent property for an entire year.[9]

**1.    Mortgage Contracts Establish the Legal Limits of a Loan Servicer's Powers to Conduct Property Inspections**

52.    Mortgage loan contracts establish the parameters of the relationship between and among a borrower, the Lender, and Loan Servicer. The mortgage contracts have provisions that govern when a Loan Servicer can order property inspections and charge a borrower for the cost of such inspections.

53.    According to Paragraph 7 of the standard Fannie/Freddie Mortgage, the Lender or its agent "may make reasonable entries upon and inspections of the Property." The Fannie/Freddie Mortgage further provides, at Paragraph 9, that if the "Borrower fails to perform the covenants and agreements contained in [the mortgage agreement] ... or Borrower has abandoned the Property, then Lender may do and pay for whatever is *reasonable or appropriate* to protect Lender's interest in the Property and rights under [the mortgage agreement] including protecting and/or assessing the value of the Property" (emphasis added). The form mortgage provides that any amount disbursed by the Lender for taking action under paragraph 9 becomes additional debt of the borrower.

54.    Loan Servicers of loans owned or guaranteed by Fannie Mae or Freddie Mac must follow the standards and procedures of the Fannie Mae and Freddie Mac Servicing Guidelines. Thus,

---

[9] *See* FHFA OIG, *FHFA Oversight of Enterprise Controls Over Pre-Foreclosure Property Inspections* (Mar. 25, 2014), *available* at https://www.fhfaoig.gov/Content/Files/AUD-2014-012.pdf

these Guidelines clarify what is "reasonable or appropriate" under Paragraphs 7 and 9 of the Fannie Mortgage.

55.     The standard FHA Mortgage states at Paragraph 5:

Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned Property. *See* e.g. Exhibit "A."

56.     However, federal regulations, discussed below, make clear that borrowers cannot be charged for property inspections unless the Lender – or Loan Servicer – has reason to believe the property is vacant.

B.     **Laws and Regulations Govern Loan Servicing Activities Including Property Inspections**

57.     Certain federal regulations and state laws govern whether Loan Servicers, including BOA, may order a property inspection and charge the inspection to a borrower.

58.     For example, the United States Department of Housing and Urban Development imposes a limitation on Loan Servicers' ability to order property inspections and charge them to borrowers. Specifically, 24 C.F.R. § 203.377, which provides, in pertinent part:

The mortgagee, upon learning that a property subject to a mortgage insured under this part is vacant or abandoned, shall be responsible for the inspection of such property at least monthly, if the loan thereon is in default. When a mortgage is in default and a payment thereon is not received within 45 days of the due date, and efforts to reach the mortgagor by telephone within that period have been unsuccessful, the mortgagee shall be responsible for a visual inspection of the security property to determine whether the property is vacant. The mortgagee shall take reasonable action to protect and preserve such security property when it is determined or should have been determined to be vacant or abandoned until its conveyance to the Secretary, if such action does not constitute an illegal trespass. "Reasonable action" includes the commencement of foreclosure within the time required by § 203.355(b) of this part.

59.     A bankruptcy court in the Eastern District of Pennsylvania ruled that Section 203.377 of the federal regulations trumps any provision to the contrary in FHA Mortgages.  *See In re Ruiz*, 501 B.R. 76 (Bkrtcy. E.D. Pa. 2013). In *Ruiz*, the court ruled that notwithstanding the Loan Servicer's

argument that the mortgage permitted inspections solely on the basis of default, the federal regulation controlled.

60.     By automatically ordering and carrying out default-related property inspections regardless of occupancy status, the condition of the property, or any risk of abandonment, BOA has been in blatant violation of Fannie Mae and HUD guidelines.

### C.     BOA's Improper Property Inspection Practices

61.     BOA is one of the largest loan servicers in the United States for home loans, servicing an estimated 13,500,000 home mortgage loans.[10]  As part of is mortgage servicing practices, BOA utilizes an automated and computerized loan servicing platform that is programed to automatically and systematically take specific steps in response to various triggers that may occur in the loan servicing process. BOA intentionally uses this automated loan servicing platform that automatically triggers orders for property inspections whether or not they are needed or permitted under the terms of the BOA's agreements.

62.     BOA claims that it engages in property inspections only under certain agreed-upon circumstances and only to ensure that the property has not been damaged or abandoned when, in fact, these inspections are conducted and billed automatically, whether they are necessary for the preservation of the property and permitted by contract, or not.

63.     Moreover, BOA claimed, through the issuance of monthly statements and other demands for payment, that the fees charged for property inspections ordered by BOA were fair, lawful, and reasonable when, in fact, they are the consequence of an unlawful scheme to mark-up property inspection fees solely to enrich BOA outside the scope of its contractual agreements.

---

[10] *See In re Bank of America, N.A.,* No. AA-EC-11-12, OCC, Consent Order dated April 13, 2011, and materials *available* at https://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf.

64.     BOA's scheme takes advantage of the current structure of the mortgage industry. While the mortgage documents and Lender guidelines permit and, in some circumstances, require the Loan Servicer to conduct certain property inspections, BOA's unlawful practices ignore these guidelines and imposes, without limitation: (a) unfair and excessive property inspections that are not permitted by mortgage documents; (b) more property inspections than are required; (c) more property inspections than are permitted by federal regulations and state laws; (d) more property inspections than are warranted by the circumstances of any actual loan—i.e., without any regard for whether the property is occupied or any other factor that would make inspections warranted; and (e) impermissibly inflates charges for property inspections– some of which never occur.  BOA engages in this scheme with minimal risk because Fannie Mae/ Freddie Mac agrees to reimburse BOA for the property inspection charges in the event that the borrower does not pay them.[11] Fannie Mae also agrees to reimburse BOA for any escrow account advances made to cover taxes, insurance, and other default related and foreclosure proceedings, which is the subject of the forced placed hazard insurance fees claims below.[12]

65.     The BOA fraudulent and improper property inspection scheme has harmed Plaintiff and the Class because: (1) they are charged for multiple, unnecessary, unreasonable, or otherwise unlawful drive-by inspections; and (2) BOA counts on the bogus inspection charges going unpaid due

---

[11] Fannie Mae's current servicer guidelines allow for reimbursement of $15 per exterior property inspection.  *See* *https://servicing-guide.fanniemae.com/THE-SERVICING-GUIDE/Part-F-Servicing-Guide-Procedures-Exhibits-Quick-Referen/Chapter-F-1-Servicing-Guide-Procedures/F-1-05-Expense-Reimbursement/1045188371/F-1-05-Expense-Reimbursement-03-10-2021.htm#Defined.20Expense.20Reimbursement.20Limits*

[12] According to Fannie Mae's servicing guidelines:
> "Fannie Mae will reimburse the servicer for real estate taxes and property and flood insurance premiums it advances to protect Fannie Mae's interests when there are insufficient funds in the escrow account to cover payments (or for a non-escrowed mortgage loan). Such escrow advances are reimbursable even if the expenses were advanced prior to the mortgage loan becoming delinquent. However, to be eligible for reimbursement, the mortgage loan must have subsequently become delinquent."

*https://servicing-guide.fanniemae.com/THE-SERVICING-GUIDE/Part-F-Servicing-Guide-Procedures-Exhibits-Quick-Referen/Chapter-F-1-Servicing-Guide-Procedures/F-1-05-Expense-Reimbursement/1045188371/F-1-05-Expense-Reimbursement-03-10-2021.htm#Reimbursement.20for.20Escrow.20Advances*

to the borrower's default status, and as a result tacks on additional fees, thus causing a debt spiral, rendering it difficult, if not impossible for the defaulted borrower to become current.

66.     Due to the high volume of loans BOA services, tens of thousands of borrowers have been victims of the BOA's property inspection fee scheme.

67.     Specifically, the BOA property inspection scheme works as follows:  When a borrower misses a loan payment, or a loan otherwise becomes in default, BOA's loan servicing platform automatically, and without regard to owner/investor (i.e. Fannie Mae or Freddie Mac) guidelines and/or actual need, orders property inspections that are excessive in frequency and price, or otherwise unfair. Based upon BOA's practices the loan need not technically be in default under the terms of the mortgage agreement for the property inspections to be ordered.

68.     Through the use of its automated system, BOA orders the property inspections which in turn generate work orders to its exclusive field service affiliate Safeguard Properties,[13] who complete purported inspections, but in reality, merely drive by the property and check for signs of residency ("drive-by inspections"), if that. In many instances, the "inspection" is illusory or fabricated, because it is impossible even to do a drive-by inspection on the property because of, *e.g.*, gated communities.[14]

69.     BOA pays its affiliate Safeguard Properties, and then charges borrowers' accounts for the inspections.  However, BOA does not transparently disclose these inspections fee charges on a standard mortgage statement for every instance they are performed.  Indeed, absent a specific request

---

[13] In 2012 BOA and Safeguard Properties entered into an agreement whereby Safeguard Properties would acquire the employees and vendor network of the entire field service operations of BOA to assume the responsibility inspect and maintain BOA's entire portfolio of defaulted and real estate owned properties.  *See* https://safeguardproperties.com/safeguard-acquires-bank-of-americas-field-service-operations/

[14] Without any chance to obtain discovery at this point, Plaintiff is currently unaware if Safeguard Properties performed the improper inspections on his home.  Plaintiff reserves the right to amend his claims should it be determined that Safeguard Properties performed these fraudulent inspections.

by the borrower for either a loan history statement or a payoff quote, BOA does not consistently disclose these inspection charges.  Instead, the charges are lumped into a category of "other advances" on the monthly mortgage statement, without explanation. This results in BOA reaping thousands of dollars from borrowers who are unlikely to know of and challenge the fees when fighting to save their homes.

70.     What makes BOA's scheme more outrageous is the fact that loan insurers, such as Fannie Mae, specifically agree to reimburse loan servicers, in this case BOA, for all property inspections the servicer must perform on a delinquent mortgage.  What that plainly means is that regardless of whether the Borrower is able to crawl their way out from the additional fees BOA has heaped upon their loan balance, BOA can continue to foreclose on the loan.  The result is BOA can obtain a foreclosure judgment for the amount of the loan plus the default service fees, which include the property inspection fees, and sell the property at a foreclosure sale.  Either way BOA reaps thousands of dollars in improper and fraudulent inspection fees completing dubious and unnecessary drive-by or fabricated inspections.

71.     As the United States Bankruptcy Court for the Eastern District of Louisiana held *In re Dorothy Chase Stewart*, No. 07-11113, 2008 WL 2676961 (Bkrtcy. E.D. La. July 9, 2008), a bank's practice of using computer software to automatically trigger property inspections once a borrower is a certain number of days in default -- and to continuously order those inspections thereafter until the default is cured -- is neither necessary nor reasonable as this practice is not designed to protect the lender's interest in the property. Rather, these automatic inspections are actually conducted to generate additional fees and thereby create more "float" income, boosting the bank's bottom line.

72.     It is hardly coincidental that the service fees assessed for these default-related inspections -- bearing interest at the Note rate from the date of disbursement -- can make it impossible

for borrowers to become current on their loans. Fees for default-related services can add thousands of dollars to borrowers' mortgages over time, with interest continuously accruing on the charges, driving them further into delinquency and debt.

73.     Even if the borrowers pay the delinquent principal and interest, the accumulated fees for debt related services, such as the unnecessary property inspections, ensure that the borrowers will most likely stay in default. This is so because, even after the borrower pays the delinquent principal and interest, although the next payment comes in on time, *part of the payment is applied to the fees,* therefore there is not enough to cover the entire monthly payment. This causes the partial payment to become past-due, creating a cascade of more inspection fees, and more arrears, ineluctably leading to BOA threatening to file a foreclosure action unless a huge payment is made.

74.     As a result of this scheme, which forces the borrower deeper into default, a borrower will suffer damage to his credit score. The matters reported to a consumer credit bureau include whether a borrower has been late with a mortgage payment or missed any payments. By keeping a borrower in default with this scheme, BOA ruins a borrower's credit score and dictates whether the borrower can get a loan in the future - and what that borrower's interest rate will be on such a loan.

75.     Due to the high volume of loans BOA services, tens of thousands of borrowers have been victims of this scheme.

76.     By sending out monthly mortgage statements referencing charges for purported default-related property inspections, BOA is representing to the delinquent borrowers that each inspection fee is reasonable and necessary. However, that representation is false. Having worked with its affiliates, such as Safeguard Properties to devise and implements policies and systems for the automated assessment of property inspection fees, BOA knows that its inspection fees are neither reasonable nor necessary.

77.     BOA's property inspection scheme is successful as (1) BOA uses its affiliates, such as Safeguard Properties, as a go-between for drive-by and fabricated inspections; (2) BOA systematically and automatically causes the inspections to be ordered, whether they are needed, permitted, or lawful, or not; and (3) loan investors/insurers (such as Fannie Mae) rely on BOA to follow their guidelines and government regulations, but cannot or do not police BOA's activities for compliance.

78.     Plaintiff and Class Members are harmed by the scheme because (1) they are charged for multiple, unnecessary, unreasonable, or otherwise unlawful drive-by inspections; and (2) because BOA counts on the bogus inspection charges going unpaid due to the borrower's default status, and as a result tack on additional late fees, thus causing a debt spiral, rendering it difficult, if not impossible for the defaulted borrower to become current.

79.     As a result of the property inspection scheme, BOA has obtained Plaintiff's and the Class' money and damaged their property, as well as increased their debt obligations without justification and contrary to applicable law.

### III.   Forced-Placed Insurance Practices

80.     Lenders and Loan Servicers, like BOA here, force place insurance coverage when a borrower fails to obtain or maintain proper hazard, flood, or wind insurance coverage on the property that secures his or her loan. Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to "force place" new coverage on the property to protect its interest and then charge the borrower the cost of coverage.  BOA's force-placed insurance scheme takes advantage of the broad discretion afforded the lenders and servicers in standard form mortgage agreements.

81.     Permitting a lender to forcibly place insurance on a mortgaged property and charge the borrower for the cost of the coverage is neither a new concept nor a term undisclosed to borrowers in

mortgage agreements. The standard form mortgage agreements owned or serviced by BOA include a provision requiring the borrower to maintain hazard insurance coverage, flood insurance coverage if the property is located in a Special Flood Hazard Area ("SFHA") as determined by the Federal Emergency Management Agency ("FEMA"), and wind insurance coverage on the property securing the loan, and in the event the insurance lapses, permit the lender to obtain force-placed coverage and charge the borrower for the cost rather than declare the borrower in default.

82.     The money to finance the forced-placed insurance schemes comes from unsuspecting borrowers who are charged inflated amounts for force-placed insurance by lenders or servicers – BOA here. Borrowers are required to pay the full amount that the lender or servicer initially pay to the insurer.

83.     Over the past several years, California has become the second largest hub of forced-placed insurance activity nationwide. Only being surpassed by Florida which has more than one-third the volume of all forded-placed insurance policies affecting borrowers.

84.     Each mortgage agreement contains a standard clause which governs and mandates the maintenance of hazard and/or flood insurance and empowers lenders to force-place insurance in its absence.

85.     For example, the standard Fannie Mae/Freddie Mac mortgage agreement contains the following standard provision:

**5. Property Insurance**. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires….

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the

Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

86.    Additionally, the standard FHA mortgage agreement contained a similar clause that stated as follows:

**4. Fire, Flood and Other Hazard Insurance**. Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss directly to Lender, instead of Borrower and to Lender jointly. All or any part of the insurance proceeds may be applied by Lender, at its option, either (a) to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order in paragraph 3, and then to prepayment of principal, or (b)to the restoration or repair of the damaged Property, Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments which are referred to in paragraph 2, or change the amount of such payments. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

87.    Plaintiff and all Class Members' mortgages contained the same or nearly identical language as identified above.

88.    Specifically, Plaintiff's and the Class Members' mortgage loan contracts, which are standardized mortgage contracts, do not permit the lender or loan servicer to receive a financial benefit

in connection with force-placed insurance policies. Instead, the contracts only allow costs that are reasonable and necessary to protect the lender's interest in the secured property to be passed on to the borrower.

89.     The discretion afforded to lenders to force-place insurance is limited by the bounds of reasonable conduct and by the express terms of the mortgage contract itself.  Lenders, such as BOA, routinely exceed the bounds of reasonableness and the spirit, intent, and letter of the mortgage contract itself by force-placing insurance in a manner and in amounts that are not required to protect the lender's interest in the property in an effort to reap profits from the borrower which are not required nor contemplated by the mortgage contract and through other conduct described herein with respect to the force placement of insurance.[15]

90.     The forced placement of insurance policies can be a very lucrative business for loan servicers. Commonly, the loan servicer selects the force-placed insurance provider in accordance with a pre-arranged agreement and force-places the policy in such a way as to receive a financial benefit from the provider. The financial benefits typically, and as is the case here, take the form of reduced cost services such as insurance tracking services and unearned commissions.

91.     The mortgage contract does not disclose that the lender or servicer, or their affiliates, will receive a "commission" or other compensation from the force-placed insurance providers for purchasing the insurance or that the commission will be based upon a percentage of the cost of the premium of the forced-placed insurance. Furthermore, the mortgage contract does not disclose that the cost of the forced-placed policy will incorporate certain costs not properly chargeable to the borrower.

---

[15] *See* Fannie Mae Servicing Guide B-6-01: Lender-Placed Insurance Requirements (10/14/15), *available* at https://servicing-guide.fanniemae.com/THE-SERVICING-GUIDE/Part-B-Escrow-Taxes-Assessments-and-Insurance/Chapter-B-6-Lender-Placed-Insurance/B-6-01-Lender-Placed-Insurance-Requirements/1041095611/B-6-01-Lender-Placed-Insurance-Requirements-10-14-2015.htm

92.     Any commissions received by lenders or servicers are unearned and unreasonably charged to borrowers as part of the forced-placed insurance premiums.  Indeed, no services are performed for these commissions. Rather, any nominal services performed in relation to the placement of the forced-placed policies are performed by the lender's selected insurance provider ("Insurer"), not the lender itself. The Insurer is more than compensated for any services they perform through the portion of the forced-placed insurance premiums they retain. The charges passed on to the borrowers for the forced-place insurance are inflated to provide lenders, such as BOA, and their affiliates with kickbacks in the form of "commissions," "qualified expense reimbursements," or reinsurance arrangements, and to cover the cost of discounted mortgage servicing functions, and other unmerited charges.

93.     Additionally, once a lapse in hazard or flood insurance occurs, borrowers, such as Plaintiff and the Members of the Class have no way of refusing the charges for the forced-placed insurance premiums. Likewise, once a lapse occurs, and the lender or servicer decides to force place insurance, borrowers have no way of retroactively placing the policy with a low-cost insurance provider. The decision is 100% that of the lender and borrowers are completely at the mercy of the lender to exercise its discretion in good faith when force-placing the policy and selecting the insurance provider and applicable rate.

94.     These lender-placed or forced-placed insurance policies are almost always more expensive than standard insurance coverage. Such policies can cost as much as twelve times more than comparable or better, more comprehensive insurance policies that are easily available in the marketplace. While the forced-placed insurance policy is for the benefit of the lender, the cost is passed on to the borrower.

95.     Loan servicers, including BOA, also do not perform their own insurance tracking. Instead, BOA and other loan servicers contract with the insurer or the insurer's affiliate to perform the tracking services at a reduced cost. In BOA's case, prior to 2011, BOA's tracking functions were performed by BOA's own affiliate which was owned by BOA's affiliated insurance company. The reduction in the cost of the services is made up by the company as part of the force-placed insurance charges to borrowers.

96.     Indeed, during his testimony before the Property and Casualty Insurance and the Market Regulation and Consumer Affairs Committees at the 2012 NAIC Summer National Meeting on August 9, 2012, Joseph Markowicz of PRP Claims – an organization that claims to have been "Bridging the Lending and Insurance Communities, since 1992" – recognized that force-placed insurance premiums include not just the risk incurred, but also "administrative costs undertaken by the Lender Placed Insurance carrier on the lenders' behalf, that are bundled into the costs of the premium" which in turn are passed on to "the general public." *See* Joseph Markowicz, PRP Claims, NAIC Testimony (Aug. 9, 2012).[16] Thus, in return for purchasing higher-priced FPI, insurers provide kickbacks to lenders in the form of services, the cost of which is ultimately borne by the mortgagee.

97.     J. Robert Hunter, who is the Director of Insurance at the Consumer Federation of America, described these practices in his testimony before the New York Financial Services Department ("NYDFS") in connection with the Department's inquiry into force-placed insurance practices:

> In some instances, lenders use [force-placed] insurance as a profit center by collecting commissions from insurers through lender-affiliated agents or broker[s] or by receiving below-cost or free services (such as tracking of loans) from insurers, and/or using

---

[16] *Available* at http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance _testimony_markowicz.pdf (last visited Oct. 25, 2021).

"fronting" primary insurers to direct the coverage to lender affiliated captive reinsurers. Lenders often receive free or below cost service from affiliated service providers.[17]

As Birny Birnbaum of the Center for Economic Justice, another experienced and noted expert in the area of force-placed insurance, testified: "[s]ervicers have financial incentives to force place the insurance because the premiums include commissions and other considerations for the servicer."[18] Borrowers have no say or input into the carrier or terms of the force-placed insurance policies. The terms and conditions of the insurance policy, as well as the cost of the policy, are determined by the servicer and the insurer, rather than negotiated between the borrower and the insurer.

98.     As J. Robert Hunter in his testimony before the New York Financial Services Department argued, "lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance." *See* Hunter NYDFS Testimony at 5.  The lack of individual underwriting does not result in lower prices for consumers; quite the contrary; instead, as a result of the schemes described herein between the insurers and servicers, consumers are gouged.

99.     Fannie Mae has also changed its policies to curb bank and servicers' improper practices.  First, on March 6, 2012, Fannie Mae issued a Request for Proposal ("RFP") relating to lender placed insurance. In its RFP, Fannie Mae stated that it had conducted an "extensive internal review" of the lender-placed insurance process and found that the process "can be improved through

---

[17] *See* Testimony of J. Robert Hunter, Director of Insurance, Before the NYDFS on Force-Placed Insurance in New York (May 17, 2012) at 1, *available at* http://www.dfs.ny.gov/insurance/hearing/fp_052012/Hunter_written_testimony.pdf (last visited Oct. 25, 2021) ("Hunter NYDFS Testimony").
[18] *See* Testimony of Birny Birnbaum on behalf of the Center for Economic Justice, Public Hearing on Force-Placed Insurance before the NYDFS (May 21, 2012) at 15, *available at* http://www.dfs.ny.gov/insurance/hearing/fp_052012/fp_trans_20120521.pdf (last visited Apr. 21, 2021) ("Birnbaum NYDFS Testimony").

unit price reductions and fee transparency to the benefit of both the taxpayers and homeowners." In particular, Fannie Mae made the following observations:

(a) "Lender Placed Insurers often pay commissions/fees to Servicers for placing business with them. The cost of such commissions/fees is recovered in part or in whole by the Lender Placed Insurer from the premiums[.]"

(b) "The existing system may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing and terms.... Thus, the Lender Placed Insurers and Servicers have little incentive to hold premium costs down."

(c) "[M]uch of the current lender placed insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner."

*See* Fannie Mae Request For Proposal dated March 6, 2012.

100. Fannie Mae stated that it sought to "[r]estructure the business model to align Servicer incentives with the best interest of Fannie Mae and homeowners." Among other things, Fannie Mae sought to "[e]liminate the ability of Servicers to pass on the cost of commissions/fees to Fannie Mae" and to "[s]eparate the commissions and fees for Insurance Tracking Services from the fees for Lender Placed Insurance to ensure transparency and accountability." *Id*. at 3.

101. On March 14, 2012, Fannie Mae issued a Service Guide Announcement "amending and clarifying its policies regarding the use, coverage, requirements, deductibles, carrier eligibility requirements and allowable expenses for lender-placed insurance" for servicers of the loans it holds. *See* Fannie Mae Servicing Guide Announcement SVC-2012-04. The Fannie Mae guidelines seek to eliminate the abuses prevalent in the force-placed insurance industry (such as those engaged in by BOA) including requiring that the cost of force-placed insurance be "competitively priced" and "commercially reasonable" and must exclude:

- any lender-placed insurance commission earned on that policy by the servicer or any related entity;

- costs associated with insurance tracking or administration, or;

- any other costs beyond the actual cost of the lender-placed insurance policy premium.

*Id*. at 4.

102.   On March 26, 2013, the Federal Housing Finance Agency ("FHFA") issued a Notice regarding Lender Placed Insurance. This Notice "sets forth an approach to address certain practices relating to lender placed insurance that the [FHFA] considers contrary to prudent business practices [and] to appropriate administration of Fannie Mae and Freddie Mac (the Enterprises) guaranteed loans," and which result in "litigation and reputational risks." *See* Federal Housing Finance Agency, No. 2013-05 Lender Placed Insurance, Terms and Conditions.

103.   The FHFA prohibits:

<u>Certain Sales Commissions</u>. The Enterprises shall prohibit sellers and servicers from receiving, directly or indirectly, remuneration associated with placing coverage with or maintaining placement with particular insurance providers.

104.   The FHFA acknowledged:

(d) "Reportedly, premiums for lender placed insurance are generally double those for voluntary insurance and, in certain instances, significantly higher." *Id*. at 2.

(e)  "[T]he multiples involved may not reflect claims experience..." *Id*.

(f) "Loss ratios for lender placed insurance are significantly below those for voluntary hazard insurance and some states have required or have considered rate reductions of 30 percent or more." *Id*.

(g) "Concerns about lender placed insurance costs, compensation and practices have been raised by the National Association of Insurance Commissioners, state regulators, the Consumer Financial Protection Bureau, state attorneys general and consumer organizations. Generally, the focus has centered on excessive rates and costs passed on to borrowers, as well as commissions and other compensation paid to servicers by

carriers. In order to keep lender placed insurance costs to the Enterprises as low as possible, practices that provide incentives for and do not deter higher costs should be avoided." *Id*. at 3

### A.     BOA's History of Forced-Placed Practices

105.     BOA, in particular, made its decision to force-place flood insurance together with its affiliate Balboa Insurance Company ("Balboa") and other insurance affiliates until Balboa sold its force-placed insurance business to QBE First Insurance Agency ("QBE") in 2011. BOA's arrangement with QBE stemmed from that sale and was governed by contracts executed contemporaneously therewith.   BOA continued that scheme with QBE until 2015 when National General Holding Corporation purchased of the operations of QBE and had its subsidiary Integon National Insurance Company ("Integon) perform all its forced-placed insurance functions.   BOA's arrangement with Integon stemmed from the sale of QBE and is governed by contracts executed contemporaneously therewith.

106.     Both before and after Balboa's sale of its force-placed insurance business, BOA unfairly profited from the forced placement of insurance on borrowers. BOA's affiliates charged and continue to charge excessively high insurance premiums above what an independent insurance company would charge, even though those insurance policies are, as described in BOA's letters to Plaintiff, limited compared with independently written insurance policies.

107.     BOA paid a reduced-cost fee to its affiliate Newport Management Corporation ("NMC") to monitor BOA's loan servicing portfolio for insurance that met BOA's requirement. When a lack of such insurance was detected, BOA commenced a letter cycle that demanded evidence of acceptable insurance. If the borrower failed to provide evidence of insurance that met BOA's requirements, the cycle culminated in a force-placed insurance policy being issued and charged to the borrower.

108.    This process was highly automated. NMC would issue an order for force-placed insurance policies in a nightly batch. NMC would order the policies through a surplus lines broker which would, in turn, obtain the policy from a carrier. The surplus lines broker was also an affiliate of BOA until Balboa sold its force-placed business to QBE. Both NMC and the surplus lines broker took commissions on the force-placed policies. At times, an additional commission was paid to BOA's affiliated insurance agency, Bank of America Insurance Services, Inc. ("BAISI").

109.    When Balboa sold off the force-placed insurance business to QBE, BOA entered into exclusive agreements with QBE to run BOA's force-placed insurance program. Pursuant to the agreements, BOA continued to receive reduced-cost insurance tracking services. The agreements also provided for BOA to continue to receive a share of profits attributable to the force-placed insurance business sold to QBE.

110.    BOA had engaged in the above practices to realize unfair financial gains from borrowers. By adding the cost of force-placed insurance to borrowers' loan balances, BOA earns additional interest on the amounts charged, and causes borrowers to incur additional costs and fees. However, these practices continue unimpeded, and despite agreeing to curtail these improper practices, BOA and its affiliates continue to this day to exact the exact same scheme against tens of thousands of borrowers, including Plaintiff.  Instead of Balboa or QBE, it is now Integon that assists BOA in perpetuating its forced-placed insurance scheme.

### B.    The Current Forced-Placed Insurance Scheme

111.    As stated above, BOA has engaged in this forced-placed insurance scheme with Integon to generate additional fees and income for themselves at the expense of Plaintiff and Class members by requiring borrowers whose loans it services to purchase additional hazard insurance and/or flood insurance in excess of the requirements of the mortgage agreements, HUD, and the Fannie

Mae/Freddie Mac guidelines. Through this practice, BOA generated significant profits for itself and its affiliates through, inter alia, commissions, kickbacks, and in-kind payments and other fees.

112.    BOA's force-placed insurance program was operated in coordination with Integon.[19] [20] Upon information and belief, during the class period, BOA had exclusive agreements with Integon to provide certain mortgage service functions that are properly BOA's responsibilities, and that BOA is paid to perform by the owners of the loans.  Pursuant to these agreements, BOA had its loan servicing portfolio automatically tracked to identify when an individual borrower's voluntary policy lapses or to ensure that each borrower whose property was in an SFHA had flood insurance that met BOA's requirements. When Integon determines that such insurance was not maintained, a letter cycle commences whereby letters are generated, upon information and belief by Integon and not BOA as is the typical function. Those letters demanded that Plaintiff and Class members provide proof of acceptable insurance. If the borrower fails to provide proof of acceptable insurance, a force-placed policy is obtained for the borrower and the premium is charged to the borrower. Pursuant to BOA's agreements with Integon, BOA receives a percentage of the premiums charged to borrowers directly paid by Integon.

113.    The scheme works as follows. BOA contracts for Integon to take over various mortgage servicing functions and for a master insurance policy that covers its entire portfolio of mortgage loans.

---

[19] National General Holding Corporation ("National General") is the parent company of Integon.  Integon conducts all forced placed property insurance operations for National General.  National General entered the forced placed insurance market in 2015 through the purchase of the operations of QBE.  Integon performs numerous services related to its role in tracking properties for BOA's lender-placed insurance program.

[20] Prior to 2015 BOA's forced placed insurance scheme was coordinated through QBE First Insurance Agency ("QBE")[20] and its predecessor entities Balboa Insurance Group ("BIG"), Balboa Insurance Company ("BIC") and Newport Management Corporation ("NMC") (collectively "Balboa") and involved various other BOA entities including but not limited to Banc of America Insurance Services, Inc. ("BAISI") and non-BOA entities including but not limited to Southwest Business Corporation ("SWBC"), Lexington Insurance Company ("Lexington"), Illinois Union Insurance Company ("Illinois Union") and Lloyd's of London ("Lloyds").   In 2011, QBE purchased the lender placed insurance program and portfolio of Balboa Insurance Group, including the lender placed insurance program of BOA. Balboa Insurance Group and its subsidiaries, Balboa Insurance Company and Newport Management Company, operated BOA's force-placed flood insurance program until the sale to QBE. After that sale, QBE has taken over BOA's force-placed insurance program.

In exchange, Integon is given the exclusive right to be the sole force-place insurance provider on property securing a loan within the portfolio when the borrower's insurance lapses, or the lender determines the borrower's existing insurance is inadequate.

114.    Integon monitors BOA's entire loan portfolio for lapses in borrowers' insurance coverage.  Once a lapse is identified, an automated cycle of notices, purporting to come from BOA but, upon information and belief, actually generated by Integon, is sent to the borrowers to inform them that insurance will be purchased and force-placed if evidence of the voluntary coverage is not produced and continued. In reality, however, the master policy, described above, is already in place and BOA does not purchase a new policy on the individual borrower's behalf; rather, a certificate of insurance from the master policy is automatically issued by Integon. If a lapse continues or the borrower does not provide evidence of acceptable coverage in the requisite amount of time, the borrower is notified that insurance is being force-placed at his or her expense.

115.    No individualized underwriting ever takes place for the force-placed coverage. Insurance is automatically placed on the property and the inflated amounts, including the unlawful kickbacks, are charged to the borrower. In many instances, the insurance lapse is not discovered for months or even years after the fact. Despite the absence of any claim or damage to the property during the period of lapse, coverage is placed on the property and the borrower is charged for the "cost" of the retroactive coverage.

116.    BOA then pays Integon for the certificate of insurance, which issues from the already-existing master policy. It is BOA, not the borrower, that is obligated to pay Integon for the force-placed insurance pursuant to the agreements between BOA and Integon (and borrowers are not parties to, nor are they even the named insured), which govern the mortgage servicing functions that Integon

performs as well as the procurement of the master policy, and are executed and already in place before the borrower's coverage lapses.

117. Once coverage issues and BOA has paid Integon the full amount invoiced, Integon kicks back a set percentage of that amount to BOA without BOA performing any functions related to the placement of coverage or incurring any costs. The kickbacks paid to BOA or its affiliates are disguised as "commissions," "reinsurance payments," or "expense reimbursements."

118. The payment is not compensation for work performed; it is an effective rebate on the premium amount, reducing the cost of coverage that BOA pays to Integon. The "commissions" or "expense reimbursements" are not legitimate reimbursements for actual costs, nor are they payments that have been earned for any work done by BOA or an affiliate related to the placement of the insurance; they are unlawful kickbacks to BOA for the exclusive arrangement to forced-place insurance.

119. The money paid back to BOA is not given in exchange for any services provided by them; it is simply grease paid to keep the force-placed machine moving. In an attempt to mask the kickbacks as legitimate, Integon, in letters purporting to come from BOA, will often disclose to the borrower that BOA may earn commissions or compensation as a result of the forced placement of new coverage. A copy of such a letter sent to Plaintiff is attached hereto as Exhibit "B". In reality, however, no work is ever done by BOA to procure insurance for that particular borrower because the coverage comes through the master policy already in place – and the process is largely automated by Integon. As a result, no commission or compensation is "earned" and, in addition, neither BOA nor its affiliates incur any costs in relation to force-placing insurance on any particular borrower and therefore no "expense reimbursement" is due.

120.     Once the certificate of insurance is issued on an individual borrower, BOA then charges the borrower the full, "pre-rebate" amount for the coverage while purporting to charge the borrower the cost of the insurance coverage in keeping with the borrower's mortgage agreement. The inflated amount is either deducted from the borrower's mortgage escrow account or added to the balance of the borrower's loan.[21]  The borrower's escrow account is depleted irrespective of whether other escrow charges, such as property taxes, are also due and owing.

121.     Under this highly profitable forced-placed insurance scheme, BOA is incentivized to purchase and force-place insurance coverage with artificially inflated premiums on a borrower's property because the higher the cost of the insurance policy, the higher the kickback.  As a result of the kickbacks, BOA effectively pays a reduced amount for forced-placed insurance coverage but does not pass these savings on to its borrowers.

122.     Additionally, BOA and Integon enter into agreements whereby BOA is paying Integon not only for forced-placed insurance premiums, but also for a bundle of services including performing BOA's obligations of administering and servicing the mortgages (i.e., monitoring and tracking BOA's portfolio for insurance lapses and providing notification and customer service to homeowners under the mortgage).  Integon offers to take on these mortgage servicing functions at a discount to maintain its exclusive right to force-place insurance on BOA borrowers. Indeed, upon information and belief, Integon does not perform these services for a lender without also being the exclusive provider of forced-placed insurance.

123.     The full costs of the servicing activities are added into the force-placed amounts which are then passed on to the borrower. Integon can provide these services at below cost because of the

---

[21] On some occasions, when a borrower does not have an escrow account, an escrow account with a negative balance is created and the borrower is charged to bring the balance to zero

enormous profits they make from the hyper-inflated amounts charged for force- placed insurance. However, because insurance-lapsed mortgaged property typically comprises only 1-2% of the lenders' total mortgage portfolio, the borrowers who pay the charges from the lenders unfairly bear the entire cost to service the entire loan portfolio.  These charges, passed on to Plaintiff and the Members of the Class, are not properly chargeable to the borrower because they are expenses associated with the servicing of all the loans and the loan servicers are already compensated for these activities by the owners of the loans (e.g., Fannie Mae).

124.    In addition, upon information and belief, Integon enters into essentially riskless "captive reinsurance arrangements" with BOA's affiliates to "reinsure" the property insurance force-placed on borrowers. A recent *American Banker* article illustrated this reinsurance problem using JPMorgan Chase's program by way of example:

> JPMorgan and other mortgage servicers reinsure the property insurance they buy on behalf of mortgage borrowers who have stopped paying for their own coverage. In JPMorgan's case, 75% of the total force-placed premiums cycle back to the bank through a reinsurance affiliate. This has raised further questions about the force-placed market's arrangements. . . .

> Over the last five years, Chase has received $660 million in reinsurance payments and commissions on force-placed policies, according to New York's DFS. . ..

> Of every hundred dollars in premiums that JPMorgan Chase borrowers pay to Assurant, the bank ends up keeping $58 in profit, DFS staff asserted. The agency suggested the bank's stake in force-placed insurance may encourage it to accept unjustifiably high prices by Assurant and to avoid filing claims on behalf of borrowers, since that would lower its reinsurer's returns.

> The DFS staff also questioned the lack of competition in the industry, noting that Assurant and QBE have undertaken acquisitions that give them long- term control of 90% of the market. Further limiting competition are the companies' tendency to file identical rates in many states.

J. Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, May 18, 2012,   *available    at*   http://www.americanbanker.com/issues/177_97/chase-reinsurance-deals-regulator-attack-1049460-1.html.

125.     BOA's reinsurance program, like those of other lenders, is simply a way to funnel profits, in the form of ceded premiums, to BOA at borrowers' expense. While reinsurance can, and often does, serve a legitimate purpose, here it does not. On information and belief, BOA enters into reinsurance agreements with Integon that provide that the insurer will return significant percentages of the forced-placed insurance charges by way of ceded reinsurance premiums to BOA affiliates or subsidiaries – which in turn pass on these profits to BOA.  The ceded premiums are nothing more than a kickback to BOA and a method for BOA to profit from the forced placement of new coverage. Indeed, while BOA purportedly provided reinsurance, they did not assume any real risk.

126.     BOA also overcharges borrowers by disregarding the Standard Mortgage Clause or the Lender's Loss Payable Endorsement ("LLPE") in the standard form mortgage agreement. Both of these clauses typically protect the lender for a period of at least ten days after the termination of the homeowner's voluntary insurance policy. Forced-placed insurance policies, however, take effect on the date of termination, and "double-cover" the property unnecessarily during the period covered by the LLPE or Standard Mortgage Clause. This means the borrower is charged for coverage for which the lender or servicer has no exposure.

127.     The amounts charged to borrowers are also inflated by the interest that accrues on the amounts owed for forced-placed coverage; when BOA adds the charge for the forced-placed insurance to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to the lender.

128.     The actions and practices described above are unconscionable and undertaken in bad faith with the sole objective to maximize profits. Borrowers who for whatever reason have stopped paying for insurance or are under-insured on mortgaged property are charged hyper-inflated and illegitimate noncompetitive amounts for forced-placed insurance.   These charges are inflated to

include undisclosed kickbacks to the Defendants (who, as described above, perform little to no functions related to the force-placement of the individual policies), as well as the cost of captive reinsurance arrangements, and discounted mortgage servicing functions.

129.    Borrowers have no say in the selection of the force-placed insurance carrier or the terms of the forced-placed insurance policies. Forced-placed policies are commercial insurance policies with premiums intended for all lender or servicer clients of Integon and are meant to protect their interest in the property. The terms are determined by the lender or servicer - BOA, and the insurer - Integon. Because they are commercial policies, borrowers cannot purchase force-placed policies on their own.

130.    Plaintiff here does not challenge BOA's right to force place insurance in the first instance. Plaintiff challenges Defendants' manipulation of the force-placed insurance market with an eye toward artificially inflating the amounts charged for force-placed insurance through unlawful kickback arrangements and placing unnecessary coverage, which BOA purchases from Integon and then chooses to pass on to the borrower. Lenders or servicers, like BOA, are financially motivated to utilize the insurer, like Integon, that offers it the best financial benefit in the terms of "commissions," "expense reimbursements," discounted mortgage servicing functions, or ceded reinsurance premiums – all at the expense of Plaintiff and the Class.

## V.

## PLAINTIFF'S ALLEGATIONS

131.    Plaintiff Castorina purchased the Property at issue in 1995.  Through a series of transactions and transfers the operative mortgage loan agreement which encumbered the property, a standard FHA Deed of Trust, was executed on or about April 25, 2003 (the "Mortgage").  A copy of Plaintiff's Mortgage is attached hereto as Exhibit "A."  The lender for Plaintiff's Mortgage was

originally Countrywide Home Loans, Inc. In 2008 BOA purchased all the home loans and business of Countrywide during the mortgage crisis that precipitated the financial crisis later that year.  As part of that purchase, BOA became the lender and servicer of Plaintiff's Mortgage.

132.    Typical of the mortgages for the members of the Class, Plaintiff's Mortgage contained a provision that required him to secure and pay for adequate property insurance that protected the Property against loss due to hazards.

133.    Additionally, Plaintiff's Mortgage, like the mortgage agreements of the members of the Class, contained a provision that allowed BOA to inspect and safeguard the Property from damage if Plaintiff was in default; so long as BOA complied with all laws and servicing guidelines in doing so.

134.    In 2019 Plaintiff sought to complete a loan modification of his Mortgage with BOA. Shortly thereafter, Plaintiff received correspondence from BOA denying his loan modification application stating the reason for the denial was BOA's in ability to confirm Plaintiff actually owned the Property.  Plaintiff immediately sent to BOA a copy of his deed to confirm his ownership. However, at this time BOA began refusing his monthly payment for the Mortgage.

135.    Indeed, without a legitimate reason, on or about September 1, 2019 BOA put Plaintiff's loan account into delinquency.[22] Despite providing BOA with all requested documentation to prove his continued ownership and occupancy of the Property, including Plaintiff having to obtain counsel to assist him, BOA refused to acknowledge he was indeed the rightful owner.   BOA made a farcical attempt to feign that they were actually trying to help Plaintiff modify his mortgage and have his

---

[22] In addition to Plaintiff's Mortgage, Plaintiff had a second loan encumbering the property, a Home Equity Line of Credit ("HELOC"). This second loan was secured by a Deed of Trust and Assignment of Rents in favor of Countrywide Home Loans, Inc and dated January 20, 2006. BOA took ownership of this loan at the time of its acquisition of Countrywide. During the events that gave rise to this claim, BOA never question ownership of refused Plaintiff's payment.

payments accepted and his account put back in good standing.  Despite this, BOA continued to deny that it was able to verify Plaintiff was the rightful owner of the property.

136.    While this was occurring BOA continued to refuse Plaintiff's Mortgage payments. Indeed, BOA did this for no other reason than to charge unnecessary default related services to Plaintiff's loan account and drive the amount owed on the property up.

137.    It is no surprise that even before BOA was allowed to conduct and charge for default related property inspections, they had done so.  A transaction summary of the charges placed against Plaintiff's loan reveal that BOA began charging for property inspections was on July 24, 2019.  BOA did not follow any of the servicer guidelines or regulations before conducting this inspection which was prohibited by law.

138.    Indeed, BOA refused to acknowledge Plaintiff as the owner of his own home, despite being in constant contact with him and having documentary evidence (including a copy of the deed and several utility bills) for twenty-two months.

139.    During that time, the records obtained by Plaintiff show that BOA conducted approximately fifteen (15) needless property inspections, some of which were for "vacant" inspections when BOA had direct knowledge Plaintiff at all times was occupying his home.  Moreover, seven (7) of these charges for property inspections were charged to Plaintiff's account on the same day, June 10, 2021; which was after Plaintiff was forced to pay $19,772.40 for BOA to bring his account out of default and stop the Trustee from taking his home.[23]  A copy of the June 10, 2021 BOA account statement for Plaintiff's Mortgage account is attached hereto as Exhibit "C."

---

[23] Per BOA's demands, and despite at all times banking with BOA, Plaintiff was forced to send a cashiers check for the reinstatement amount which was done on June 4, 2021 and received by BOA on June 7, 2021.

140.   As part of the reinstatement calculation, in total Plaintiff was forced by BOA to pay $500 in "property preservation fees" which supposedly represented the amount for the property inspections.   However, the documents reveal that Plaintiff was charged $262.50 for property inspections, $122.50 of which was charged on June 10, 2021.

141.   These figures reveal that BOA had no basis for charging the property inspection fees to Plaintiff.  Aside from a contrived reason for placing Plaintiff's home in default and at the risk of being taken, BOA's charges to Plaintiff's account evidence charges for services that were completely illusory, unnecessary, and illegal.  They were charged to Plaintiff for no reason other than for BOA to enrich itself and its affiliates.

142.   In addition to the bogus charges for default related property inspection fees, during the twenty-two months BOA refused to accept Plaintiff's payments and feigned to not be able to verify his ownership, BOA caused Plaintiff's required hazard insurance to lapse and a forced-placed policy to be put in its place.

143.   In or around November of 2019, Plaintiffs voluntary hazard insurance policy lapsed BOA then purchased a hazard forced-placed insurance policy through Integon and forced-placed it on his Property. Plaintiff has had a forced-placed policy through Integon on the property since that time and has paid the amounts for the forced-placed charges to BOA.

144.   Pursuant to the automated procedures in place, Plaintiff received letters regarding the force-placement of the Integon insurance including a letter renewing the insurance on April 19, 2021 which purportedly came from BOA but was in fact sent by Integon.

145.   The letter misrepresented to Plaintiff that BOA would be charging them for the "cost" of the insurance when in fact BOA does not charge borrowers the cost of the insurance because as a result of the kickbacks, it pays less for the insurance than what it charges to Plaintiff and other

borrowers. Further the letter did not disclose the reason the forced-placed policy was "significantly more expensive" was due to the kickback scheme that Defendants have enacted.  Indeed, the cost for the forced-placed policy was approximately twelve (12) times more expensive than Plaintiff was paying for his voluntarily purchased policy. [24]

146.    At no time did any Defendants disclose, in the letters or by any other means, that an exclusive relationship between BOA and Integon was in place and that because of the kickbacks, provided to BOA, it would effectively be paying less than what it would charge to Plaintiff and the Class for the forced-placed insurance coverage.

147.    All putative Class members received materially similar letters and notices pursuant to the automated procedures used by Defendants.

148.    There are no material differences between these Defendants' actions and practices directed to Plaintiff and their actions and practices directed to the putative class.

///

# VI.

## TOLLING OF STATUTES OF LIMITATIONS

149.    Plaintiff's claims herein are subject to equitable tolling, stemming from Plaintiff's inability to obtain vital information underlying their claims. Any applicable statutes of limitation are properly tolled because Plaintiff did not know and could not have learned the true facts underlying his claims until shortly before filing their Complaint, including the investigation of counsel.

150.    Plaintiff and the members of the Classes were or have been unable to obtain vital information bearing on their claims absent any fault or lack of diligence on their part. As further set

---

[24] In his testimony before the NYDFS, an insurance expert, Robert Hunter, argued that, "lack of underwriting should also result in much lower acquisition expenses for FPI insurers, since no sales force is required to place the insurance." *See* Hunter NYDFS Testimony at 5.

forth below, Plaintiff was not on inquiry notice of Defendants' wrongdoing and had no duty to initiate an investigation of any nature because the charges for property inspection and forced placed insurance fees were represented by Defendants to be legitimate. Plaintiff did not and could not have known of Defendants' violations of applicable consumer law, breaches of his contracts or unjust enrichment.

151.    Plaintiff was relieved of any duty to investigate because he reasonably and justifiably relied on Defendants to comply with applicable consumer law and contractual obligations.  Even assuming there had been some indication of wrongdoing, and Plaintiff had attempted to investigate, such investigation would have been futile because Defendant maintained exclusive control of the pertinent documents.

152.    Plaintiff and members of the Classes did not discover and could not have discovered, despite all due diligence, that the property inspection and fees for forced-placed insurance charged to their accounts were unfair and excessive. Plaintiff and members of the Classes did not discover and could not have discovered, despite all due diligence, the schemes alleged herein. Plaintiff's claims were thus equitably tolled until he discovered the true facts underlying his claims shortly before the filing of the Complaint.

153.    Moreover, Defendants knowingly and intentionally engaged in conduct solely calculated to induce Plaintiff to refrain from or postpone the commencement of an action.

154.    Further, Plaintiff's claims are subject to the continual accrual and/or continuous violation doctrines. Defendants engaged in continuous, repetitive, and ongoing violations of applicable consumer law and breaches of contract and, as such, the limitations period for Plaintiff's claims accrue only upon the last of the Defendants' unfair and/or illegal acts.

## VII.

## CLASS ACTION ALLEGATIONS

155.    Plaintiff brings this action individually and on behalf of all individuals similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following classes:

"The National Property Inspection Fee Class"

All persons in the United States or any United States Territory who were charged one or more property inspection fees through BOA's automated loan servicing platform, when they inhabited the property to be inspected and BOA was aware and on notice the property was inhabited or were otherwise charged an inspection fee that was in violation of the applicable servicing guidelines.

"The California Property Inspection Fee Subclass"

All individuals residing in California who own property encumbered by a mortgage serviced by BOA who were charged one or more property inspection fees through BOA's automated loan servicing platform, when they inhabited the property to be inspected and BOA was aware and on notice the property was inhabited or were otherwise charged an inspection fee that was in violation of the applicable servicing guidelines.

"The National Forced Placed Insurance Class"

All persons in the United States or any United States Territory who have or had Mortgage with BOA within the applicable statute of limitations, who were charged for a force-placed insurance policy procured through BOA or its affiliates, entities, or subsidiaries.

"The California Forced Placed Insurance Class"

All California individuals who own property encumbered by a mortgage serviced by BOA, within the applicable statute of limitations, who were charged for a force-placed insurance policy procured through BOA or its affiliates, entities, or subsidiaries.

156.    Plaintiff and Class members reserve the right to amend the Class definitions as discovery proceeds and to conform to the evidence. Excluded from the Classes are Defendants, and any subsidiary or affiliate of Defendants, and the directors, officers and employees of Defendants or their subsidiaries or affiliates, and members of the federal judiciary.

157.     Under Fed. R. Civ. P. 23(a)(1), the proposed class is made up of at least 40 persons, the joinder of whom are impracticable except by means of a class action.  The disposition of the claims in a class action will benefit both the parties and the Court.  The exact number of class members can be ascertained through discovery and review of Defendants' business records.

158.     The proposed class is ascertainable because it is defined by reference to objective criteria.  In addition, and upon information and belief, the names and addresses of all members of the proposed class can be identified in business records maintained by Defendants.

159.     In conformance with Fed. R. Civ. P. 23(a)(2), all Class members' claims (including Plaintiff's) are unified in that they arise from the same improper charging and collection practices arising out of materially identical circumstances. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the proposed class.

160.     Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff is a member of the Class. His claims are typical of all other Class Members.  All Class Members' claims are unified, as all were victims of the same collection and charging practices.

161.     Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff will adequately represent the class because she has interests in common with the proposed Class Members and she has retained attorneys who are experienced in class action litigation.

162.     Pursuant to Fed. R. Civ. P. 23(b)(3), there is a well-defined community of interest in the questions of law and fact involving and affecting the class to be represented by Plaintiff. Common questions of law and/or fact predominate over any questions affecting only individual members of the class.  Common questions include, but are not limited to, the following:

a.     Whether BOA charged for unnecessary insurance coverage including, but not limited to insurance coverage that violated the borrowers' mortgage;

b.  Whether BOA breached its mortgage contracts with Plaintiff and the Class Members by charging them for force-placed insurance that included illegal kickbacks (including unwarranted commissions or qualified expense reimbursements, and reinsurance payments) and by charging Plaintiff and the Class Members for servicing their loans;

c.  Whether BOA has been unjustly enriched at the expense of the Plaintiff and the Class Members;

d.  Whether BOA manipulated forced-placed insurance purchases in order to maximize their profits to the detriment of Plaintiff and the Class Members;

e.  Whether BOA violated TILA by failing to disclose kickbacks charged to Plaintiff and the Class Members in their mortgages;

f.  Whether BOA violated TILA by requiring unnecessary and/or excessive amounts of hazard and/or flood insurance;

g.  Whether BOA had a policy and practice of charging persons in arrears unlawful and unreasonable inspection fees;

h.  Whether Plaintiffs and Class Members are entitled to statutory damages under the TILA and the amounts thereof;

i.  Whether and to what extent BOA's automated servicing platform improperly ordered and charged inspection fees to Class Members;

j.  Whether Defendants' Property Inspection Fee scheme, as alleged herein, is illegal;

k.  Whether BOA's unauthorized and inflated charges routinely led to inaccurate loan balances, in violation of TILA;

l.  Whether Plaintiffs and Class Members are entitled to statutory damages under the TILA and the amounts thereof;

m.  Whether the Court can enter declaratory and injunctive relief; and

n.  The proper measure of disgorgement and/or actual and/or punitive damages and/or restitution, as well as other recovery to the class, including fees and costs;

163.  Further, the prosecution of separate actions by individual members of the class would create a risk of:

a.  Inconsistent or varying adjudications concerning individual members of the class that would establish incompatible standards of conduct for the defendant opposing the class; and

b.  Adjudication with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of other members not parties to such adjudications, and/or substantially impair or impede the ability of other non-party class members to protect such individual interests

164.  The class action method is appropriate for the fair and efficient prosecution of this action.

165.  Individual litigation of all claims that might be asserted by all class members would produce such a multiplicity of cases that the judicial system, having jurisdiction of the claims, would remain congested for years. Class treatment, by contrast, provides manageable judicial treatment calculated to bring a rapid conclusion to all litigation of all claims arising out of the conduct of the Defendants.

166.  The certification of the class would allow litigation of claims that, in view of the expense of the litigation, may be an insufficient amount to support separate actions.

# VIII.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT
(On behalf of Plaintiff, The National Property Inspection Fee Class and The National Forced Placed Insurance Class Against BOA)

167.    Plaintiff repeats and realleges paragraphs 1 through 154 as if fully stated herein.

168.    Plaintiff brings this cause of action on behalf of himself and the members of the National Property Inspection Fee Class and the National Forced Placed Insurance Class.

169.    The mortgage encumbering Plaintiff's and the Members of the Classes' homes are owned and/or guaranteed by Fannie Mae, Freddie Mac or HUD.

170.    The mortgage contracts at issue all use the standard Fannie Mae/Freddie Mac or HUD Uniform Security Instrument with language substantially similar to the language identified herein.

171.    The mortgage contracts dictate that where the Loan Servicer or Lender acts to protect the property, the Loan Servicer and/or Lender are obligated to do so only in a manner that is "reasonable and appropriate."

172.    The mortgage loans for Plaintiff and the Members of the Classes are all serviced by BOA.

173.    As the Loan Servicer, BOA acquired and/or retains certain contractual rights and obligations including compliance with the terms of the mortgage contracts.

174.    BOA, as described herein, ordered numerous drive-by or fabricated property inspections that often occurred at a rate in excess of once every 30 days.  BOA charged Plaintiff for each of these inspections whether they were actually completed or not.

175.    The inspections were neither reasonable nor appropriate, conducted from an off-site vantage point or not at all.  Additionally, frequency of these inspections was excessive.  BOA knew at the time the inspections were ordered that Plaintiff inhabited his home which secured the mortgage.

176.    BOA charged Plaintiff for these excessive and unfair property inspections.

177.    BOA breached Plaintiff's mortgage contract by charging Plaintiff for property inspections that Plaintiff was not required to pay for by the terms of his mortgage contract. These charges were not "reasonable and appropriate."

178.    BOA breached Plaintiff's mortgage contract by charging Plaintiff inflated property inspection fees due to the portion of the charge that was retained by BOA.

179.    Moreover, BOA breached Plaintiff and the Members of the National Forced Placed Insurance Class' mortgage agreements by charging Plaintiff and the Class Members for forced placed insurance that was unnecessary and excessive. BOA further breached these mortgage agreements by not providing Plaintiff and the Class Members with rebates on the costs of coverage there by charging them for more than the actual cost of the insurance.

180.    As the direct, proximate, and legal result of these breaches of the express terms of the contract, Plaintiff and the Members of the Classes have suffered damages and are entitled to the relief sought herein for such breaches.

## COUNT II
### BREACH OF THE IMPLIED COVENANT OF GOD FAITH AND FAIR DEALING
(On behalf of Plaintiff, The National Property Inspection Fee Class and The National Forced Placed Insurance Class Against BOA)

181.    Plaintiff repeats and realleges paragraphs 1 through 154 as if fully stated herein.

182.    Plaintiff brings this cause of action on behalf of himself and the members of the National Property Inspection Fee Class and the National Forced Placed Insurance Class.

183.    Every contract contains an implied covenant of good faith and fair dealing.

184.    In all of their actions described herein, BOA acted on its own behalf.

185.    The mortgage contracts of Plaintiff and the Classes contained an implied covenant of good faith and fair dealing, pursuant to which BOA was bound to exercise the discretion afforded it under the mortgage contract in good faith and to deal fairly with Plaintiff and the Classes.

186.    BOA's duty of good faith and fair dealing prevents it from evading the spirit of the mortgage contract by exercising discretion afforded it to order unnecessary property inspections and charge borrowers excessive fees for property inspections; and/or force placing excessive and unnecessary hazard insurance and/or flood insurance.

187.    Any discretionary authority granted to BOA under the terms of the mortgage contracts was subject to BOA's implied duty of good faith and fair dealing.

188.    BOA breached its duty of good faith and fair dealing in at least the following respects, among others:

    a.    Using an automated system that did not adequately consider the necessity for any given inspection;

    b.    Ordering a property inspection more frequently than required to perpetuate Class Member's loan delinquency;

    c.    Imposing charges for property inspections on the Class Members that are not permitted by applicable law or regulation and/or in violation of the applicable mortgage provisions;

    d.    Charging for property inspections which were not performed.

    e.    Charging for property inspections that were conducted from off-site vantage points, behind the wheel of an automobile, lasting a minute or less in duration;

f.  Charging for forced placed insurance on the Class Members that are not permitted by applicable law or regulation and/or in violation of the applicable mortgage provisions;

g.  Exercising its discretion to choose a force-placed insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting force-placed insurance policies with artificially inflated charges to maximize its own profits; and

h.  Assessing inflated and unnecessary insurance policy charges against the Class Members and misrepresenting the reason for the cost or the need of the policies.

189.  As the direct, proximate, and legal result of these breaches of the implied covenant of good faith and fair dealing, Plaintiff and the Members of the Classes have suffered damages and are entitled to the relief sought herein for such breaches.

## <u>COUNT III</u>
**VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT,**
**15 U.S.C. § 1692, et seq.**
(On behalf of Plaintiff, The National Property Inspection Fee Class and The National Forced Placed Insurance Class Against BOA)

190.  Plaintiff repeats and realleges paragraphs 1 through 154 as if fully stated herein.

191.  Plaintiff brings this cause of action on behalf of himself and the members of the National Property Inspection Fee Class and the National Forced Placed Insurance Class.

192.  Plaintiff and the Members of the Classes are a "consumer" as defined by 15 U.S.C. § 1692a(3).

193.  The mortgage loans encumbering the properties of Plaintiff and the Members of the Classes, which BOA service, are debts under the Fair Debt Collection Practices Act ("FDCPA") because each is "an[] obligation or alleged obligation of a consumer to pay money arising out of a transaction . . . [that is]…primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5).

194.    BOA is a "debt collector" of those mortgage loans as defined by 15 U.S.C. § 1692a(6) because it regularly attempts to collect, and collects, amounts owed or asserted to be owed or due another, including the mortgage debts from Plaintiff and the Members of the Class via monthly loan statements or payoff statements. These statements are uniform in form and layout and are sent using the instrumentalities of interstate commerce in connection with the business of collecting a debt. Furthermore, these statements universally identify BOA as a debt collector.

195.    BOA engaged in direct "communications" with Plaintiff and the Members of the Classes as defined by 15 U.S.C. § 1692a(2) when it sent them or their representatives monthly loan statements or payoff statements, purportedly demanding money due for reinstatement or payoff of their mortgage loans.

196.    The FDCPA creates a private right of action under 15 U.S.C. § 1692k.

197.    Congress created shared, substantive statutory rights of Plaintiff and the Members of the Classes to be privately enforced and protected under the FDCPA, which BOA has violated. *See* 15 U.S.C. §§ 1692, 1692e, 1692f.

198.    15 U.S.C. §1692e states, in relevant part,

> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
>
> ……
>
> (2) The false representation of—
> (A) the character, amount, or legal status of any debt; or
> (B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.
> ………
>
> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer

199.    15 U.S.C. § 1692f states, in relevant part,

A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law.

200.   Based on the foregoing allegations, BOA violated 15 U.S.C. § 1692e(10) as it used deceptive means of collecting debts—which contained illegal fees for improper and excessive forced placed insurance and/or improper and unnecessary property inspection fees as heretofore described; representing in monthly loan statements and payoff statements, these fees for recurring gratuitous property inspections, ordered and scheduled by automated means, and/or excessive and unnecessary forced placed insurance, in a confusing, inaccurate manner, or in a manner that would likely mislead a consumer.

201.   Based on the foregoing allegations, BOA violated 15 U.S.C. § 1692e(2)(A) because through its monthly loan statements or payoff statements imposing charges for improper and excessive forced placed insurance and/or improper and unnecessary property inspection fees; BOA represented falsely or in a misleading manner stated, or mispresented, the amount, character, or status of the amounts needed to payoff Plaintiff's and the Members of the Classes' mortgage debts.

202.   Based on the foregoing allegations, BOA violated 15 U.S.C. § 1692e(2)(B) when through its monthly loan statements or payoff statements imposing charges for improper and excessive forced placed insurance and/or improper and unnecessary property inspection fees; BOA represented falsely or in a misleading manner stated, or mispresented, the compensation that it might lawfully receive from Plaintiff and the Members of the Classes

203.   Based on the foregoing allegations, BOA used unfair means of collecting amounts for improper and excessive insurance and/or improper and unnecessary property inspection fees, in violation of 15 U.S.C. § 1692f, because the amounts were not expressly authorized by Plaintiff's and

the Members of the Classes' mortgage instruments creating their debts, as they must be under those instruments, or they were not permitted by law.

204.     These violations of FDCPA caused injury to Plaintiff and the Members of the Classes by violating the foregoing substantive FDCPA rights.

205.     As a direct and proximate result of these violations, Plaintiff and the Members of the Classes are entitled to statutory damages together with reasonable attorney's fees and costs under 15 U.S.C. § 1692(k).

<u>**COUNT IV**</u>
**VIOLATIONS OF THE TRUTH IN LENDING ACT,**
**15 U.S.C. § 1601, et seq.**
(On behalf of Plaintiff, The National Property Inspection Fee Class and The National Forced Placed Insurance Class Against BOA)

206.     Plaintiff repeats and realleges paragraphs 1 through 154 as if fully stated herein.

207.     Plaintiff brings this cause of action on behalf of himself and the members of the National Property Inspection Fee Class and the National Forced Placed Insurance Class.

208.     Plaintiff's and the Members of the Classes' mortgages were consumer credit plans secured by their principal dwellings and were subject to the disclosure requirements of the Truth in Lending Act ("TILA"), 15 U.S.C.§ 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

209.     BOA is a "creditor" as defined by TILA because it owned and/or serviced Plaintiff's mortgage and changed the terms of the mortgage so as to create a new mortgage obligation, of which BOA was the creditor.

210.     Pursuant to TILA, BOA was required to accurately and fully disclose the terms of the legal obligations between the parties. *See* 12 C.F.R. § 226.17(c).

211. BOA violated TILA, specifically 12 C.F.R. § 226.17(c), when it: (i) added force-placed insurance charges to Plaintiff's mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickbacks, reinsurance, discount mortgage servicing, and other profiteering involving BOA and/or its affiliates as a result of the purchase of force-placed insurance.

212. When BOA changed the terms of Plaintiff's mortgages to allow previously unauthorized kickbacks and insurance amounts in excess of its interests in the property, it changed the finance charge and the total amount of indebtedness, extended new and additional credit through force-placed insurance charges, and thus created a new debt obligation. Under TILA, BOA was then required to provide a new set of disclosures showing the amount of the insurance charges (i.e. finance charges) and all components thereof. On information and belief, BOA increased the principal amount under Plaintiff's mortgage when it force-placed the insurance, which was a new debt obligation for which new disclosures were required.

213. BOA adversely changed the terms of Plaintiff's loan after origination in order to allow a kickback on the force-placed insurance charges. These kickbacks are not authorized in the mortgage in any clear and unambiguous way. BOA never disclosed to borrowers the amount of the "commissions," "expense reimbursements," or other unearned profits paid to them or their affiliate.

214. BOA also violated TILA by adversely changing the terms of Plaintiff's loan after origination by requiring and threatening to force-place more insurance than necessary to protect its interest in the property securing the mortgage.

215. BOA also violated TILA through the imposition of unauthorized or inflated Property Inspections and other charges set forth herein, BOA fails to accurately disclose an accurate and proper loan balance to Plaintiff and the Members of the Classes.  As a result. BOA's TILA disclosures to

TILA Plaintiff states loan balances that are higher than they would have been but for BOA's improper charges.

216.     Acts constituting violations of TILA occurred within one year prior to the filing of the original Complaint in this action, or are subject to equitable tolling because BOA's kickbacks, reinsurance, and other unearned revenue-generating scheme was the subject of secret agreements among it and its affiliates and was concealed from borrowers.

217.     Plaintiff and the Members of the Classes have been injured and have suffered a monetary loss arising from BOA's violations of TILA.

218.     As a result of BOA's TILA violations, Plaintiff and the Members of the Classes are entitled to recover actual damages and a penalty of $500,000.00 or 1% of BOA's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

219.     Plaintiff and the Members of the Classes are also entitled to recovery of attorneys' fees and costs to be paid by BOA, as provided by 15 U.S.C. § 1640(a)(3).

**COUNT V**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT,**
**18 U.S.C. § 1961, et seq.**
(On behalf of Plaintiff, and The Forced Placed Insurance Class Against All Defendants)

220.     Plaintiff repeats and realleges paragraphs 1 through 154 as if fully stated herein.

221.     Plaintiff brings this cause of action on behalf of himself and the members of the National Forced Placed Insurance Class.

222.     At all relevant times, Defendants were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).

223.    The RICO enterprise, which engaged in and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included BOA, its affiliates, and Integon and its affiliates.

224.    The members of the RICO enterprise had a common purpose: to increase and maximize their revenues by forcing Plaintiff and the Class members to pay inflated amounts for forced-placed insurance through a scheme that inflated such amounts to cover kickbacks and expenses associated with servicing BOA's entire loan portfolio, and concealing from Plaintiff and the Class members the true nature of those charges. Defendants shared the bounty of their enterprise by sharing the illegal profits generated by the joint scheme.

225.    The RICO enterprise has functioned over a period of years as a continuing unit and had a maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

226.    BOA and Integon conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that projects into the future, lasted more than one year, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

227.    Integon directed and controlled the enterprise as follows:

    a.  Integon specifically developed and implemented guidelines and standards for the timing and content of the cycle of deceptive letters sent to borrowers about force-placed insurance, to which BOA agreed;

    b.  Integon drafted the language of the fraudulent letters and correspondence to borrowers that was specifically designed to deceive borrowers into believing that they were coming from the BOA. The letters fraudulently misrepresented the true nature of the "cost" of the insurance forced on their properties, and these letterswere approved by the BOA;

    c.  Integon ran the day-to-day operations of the force-placed scheme by, *inter alia*, tracking BOA's portfolio, mailing a cycle of form letters to borrowers notifying them that insurance coverage would be forced, and misrepresenting to borrowers both that

they would be charged only the costs of coverage and that a BOA affiliate would be paid as compensation for work performed;

d.   Integon paid kickbacks to BOA and its affiliates to maintain Defendants' exclusive relationship and keep their force-placed scheme moving forward;

228.   BOA directed and controlled the enterprise as follows:

a.   BOA outsourced loan-servicing functions to Integon, including authorizing Integon to send the three-letter cycle of notice letters to borrowers informing them that coverage was being forced on their properties;

b.   BOA charged borrowers amounts for coverage above and beyond its true cost of coverage, without disclosing to borrowers that it had received a rebate on the "premium" indicated in their notice letters;

c.   BOA deducted amounts from borrowers' escrow accounts for forced coverage, knowing that the amounts deducted exceeded its cost of coverage;

d.   BOA charged borrowers interest on the amounts already charged for forced coverage, knowing that the amounts deducted exceeded its cost of coverage.

229.   Both Defendants directed and controlled the enterprise as follows:

a.   by directing, controlling, and creating an enterprise and arrangement by which BOA would receive unearned kickbacks;

b.   by directing, controlling, and creating an enterprise and arrangement by which BOA would receive illegitimate revenues (ultimately charged to borrowers) in the form of direct payments, debt forgiveness, expense reimbursements, or "commissions," that were merely bribes to keep the exclusive relationship in place and not disclosing same to borrowers;

c.   by directing, controlling, and creating an enterprise and program by which BOA never charged the borrowers its actual or effective cost of the force-placed insurance policies;

d.   by directing, controlling, and creating an enterprise and program where Integon took money directly from borrowers' escrow accounts and took amounts which are not the actual or effective "cost" for lender placed insurance but instead, including illegal bribes and kickbacks;

e.   by developing and implementing guidelines and criteria to determine when force-placed insurance is placed on a borrower's home, in what amount, for what coverages and for what period of time—all of which resulted in inferior and more expensive insurance that covered time periods where no claims were made or resulted in "double coverage;" and

f. by developing and implementing an automated system to send the cycle of deceptive letters to borrowers, to determine the type, time period and amount of substandard and unnecessary coverage, and to remove or charge borrowers' escrow accounts automatically for improper and inflated charges.

230.   In order to further its control and direction of the enterprise, Integon paid bribes and kickbacks to BOA disguised as commissions, direct payments, reinsurance premiums, expense reimbursements, and below-cost mortgage servicing functions.

231.   As part of and in furtherance of the scheme to defraud, Defendants made numerous material omissions and misrepresentations to Plaintiff and Class members with the intent to defraud and deceive them.

232.   For example, Integon, with the approval of BOA, sent form letters to Plaintiff on BOA letterhead through the U.S. mail, stating that BOA would purchase or renew forced-placed coverage if voluntary insurance was not secured by a certain date. These Defendants represented in the letters that BOA would purchase the required coverage and charge the borrower "the cost of the insurance." In making these statements, Defendants knowingly and intentionally falsely stated that the amounts for force-placed insurance that Plaintiff was charged represented the actual cost of coverage, when in fact such amounts also included kickbacks and other costs paid as bribes to BOA, and Plaintiff was charged significantly more than BOA had paid for coverage.

233.   Defendants had a duty to correct this mistaken impression. These misrepresentations and omissions were material, as they helped Defendants advance their scheme to charge Plaintiff more than BOA's cost of coverage for forced-placed insurance and were designed to lull Plaintiff and the Class into believing that the charges were legitimate. Plaintiff (and other homeowners) would not have paid or would have contested these specific charges had Defendants disclosed that the illegal bribes

and kickbacks were included and that these forced- charges did not simply represent the cost of the required insurance coverage. One such letter was sent to Plaintiff on April 19, 2021 through U.S. mail.

234.    Integon and its affiliates, with the approval of the BOA and on BOA letterhead, also sent Plaintiff force-placed insurance notices through the U.S. mail informing them that force-placed insurance would be "significantly more expensive." However, Defendants intentionally omit that the inflated amounts charged to Plaintiff and the Class were due to kickbacks provided to BOA and included in the amounts charged Plaintiff and the Class members. Defendants had a duty to fully disclose the reasons why the forced-placed insurance would cost significantly more than insurance Plaintiff or the Class purchased for themselves.

235.    This misrepresentation and omission was material, as it gave Defendants a colorable reason to charge Plaintiff unauthorized amounts for insurance and would have influenced Plaintiff's decisions whether to pay the charges or contest them. For example, had Plaintiff known that BOA was effectively paying much less than what it charged to Plaintiff; Plaintiff would not have paid or would have contested the charges for force-placed insurance. One such letter was sent to Plaintiff on F April 19, 2021  through U.S. mail.

236.    For the purpose of executing the scheme to defraud, Defendants sent, mailed, and transmitted, or caused to be sent, mailed, or transmitted, in interstate or foreign commerce numerous materials, including but not limited to the notices and letters described above informing Plaintiff and Class members that they could charge Plaintiff and Class members unauthorized amounts for force-placed insurance.

237.    This scheme to defraud proximately injured Plaintiff and the Class members because it prevented them from making an informed decision regarding whether to dispute or pay the force-placed charges, or whether to allow new coverage to be placed on their property. Had they known that

the charges included kickbacks and other improper charges and that BOA was actually paying less than what it charged Plaintiff and the Class members, they would not have paid them or would have contested them. Defendants also transferred sums among themselves, including but not limited to kickbacks, in furtherance of their scheme to defraud Plaintiff and Class members, in violation of the wire fraud statutes.

238. By reason and as a result of Defendants' conduct and participation in the racketeering activity alleged herein, Defendants have caused damages to Plaintiff and Class members in the form of unreasonably high force-placed insurance premiums.

239. Plaintiff and Class members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

**COUNT VI**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT,**
**18 U.S.C. § 1961, et seq.**
(On behalf of Plaintiff, and The Forced Placed Insurance Class Against All Defendants)

240. Plaintiff repeats and realleges paragraphs 1 through 155 as if fully stated herein.

241. Plaintiff brings this cause of action on behalf of himself and the members of the National Forced Placed Insurance Class.

242. At all relevant times, Defendants were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(d). Defendants agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

243. BOA and Integon illegally agreed to violate RICO, 18 U.S.C. § 1962(d), by, *inter alia*:

    a. Agreeing that Integon and its affiliates would be BOA's exclusive force-placed insurance providers and would provide BOA and effective rebate on the cost of the insurance, through the aforementioned kickbacks, that would not be passed onto the borrowers and thereby extracting unauthorized amounts from BOA's customers;

b.  Agreeing that Integon would monitor BOA's mortgage portfolios for lapses in voluntary insurance and would, with the approval of BOA, send misleading notices to borrowers. These misleading notices would inform the borrowers that if new coverage were not procured, coverage would be forced, the borrower would be charged "the cost of the insurance" and earned "commissions" payments would be paid to BOA or a BOA affiliate;

c.  Entering into illusory commission or other agreements in order to disguise the true nature of the amounts charged to borrower under the guise of force-placed insurance; and

d.  Agreeing to commit two or more predicate acts as described above in Count V.

244.  Upon information and belief, BOA receives directly, or BOA affiliates pass profits from this scheme to BOA through credits in their general ledge accounts.

245.  Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

246.  As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiff and Class members suffered damages in the form of unreasonably high force-placed insurance premiums.

247.  Plaintiff and Class members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## COUNT VII
### VIOLATIONS OF THE ROSENTHAL FAIR DEBT COLLECTIONS ACT
### Cal. Civ. Code § 1788, et seq.
(On behalf of Plaintiff, and The California Forced Placed Insurance Class and the California Property Inspection Fee Class Against BOA)

248.  Plaintiff repeats and realleges paragraphs 1 through 154 as if fully stated herein.

249.  Plaintiff brings this cause of action on behalf of himself and the members of the California Forced Placed Insurance Class and California Property Inspection Fee Class.

250.  BOA is a "debt collector" within the meaning of California Civil Code section 1788.2(c) because BOA sent mortgage statements to Plaintiff and to the Class, Plaintiff and the class

made mortgage payments to BOA, BOA accepted those payments, and BOA made demands for payment after delinquency and/or default by sending letters, making telephone calls, and other attempts to collect mortgage payments.

251.   The monies allegedly owed by Plaintiff are a "debt" within the meaning of California Civil Code section 1788.2(d) because Plaintiff's promissory note secured by his real property is "money, property or their equivalent which is due or owing or alleged to be due or owing from a natural person to another person."

252.   As alleged herein, and as set forth in detail above, Defendants have committed violations California's Rosenthal Fair Debt Collection Practices Act, California Civil Code section 1788 ("RFDCPA"), which incorporates by reference, and requires compliance with, the provisions of the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692. The FDCPA and, therefore, the RFDCPA, prohibits, without limitation: making false, deceptive, or misleading representation or means in connection with the collection of any debt, 15 U.S.C. § 1692e and using unfair or unconscionable means to collect or attempt to collect any debt, 15 U.S.C. § 1692f.

253.   BOA made a false, deceptive, or misleading representation to Plaintiff, when it attempted to collect by representing to Plaintiff that Plaintiff must make payments for Escrow Account Advances (which contained illegal fees for excessive and improper forced-placed insurance), and the fees for Property Inspections that were not conducted, excessive, and not permitted, when, as stated above, BOA knew that the fees, and as a corollary, the total amounts incorporating them, were not legitimate debts.

254.   BOA used unfair or unconscionable means to collect or attempt to collect any debt when it attempted to collect on Escrow Account Advances (which contained illegal fees for excessive and improper forced-placed insurance), and the fees for Property Inspections that were not conducted,

excessive, and not permitted, including taking or threatening to report adverse action on Plaintiff's credit report.

255.    Based on the foregoing allegations, BOA violated the RFDCPA, by attempting to collect Escrow Account Advances (which contained illegal fees for unnecessary and duplicative flood insurance), and the fees for Property Inspections that were not conducted, excessive, and not permitted, when, as stated above, it knew it had no legal right to collect the fees, and as a corollary, no legal right to collect the total amounts incorporating them.

256.    Pursuant to California Civil Code sections 1788.30 and 1788.17, Plaintiff is entitled to recover actual damages sustained as a result of BOA's violations of the RFDCPA. Such damages include, without limitation, monetary losses and damages, and emotional distress suffered, which damages are in an amount to be proven at trial. In addition, pursuant to California Civil Code sections 1788.30 and 1788.17, because BOA's violations of the RFDCPA were committed willingly and knowingly. Plaintiff is entitled to recover statutory damages of at least $1,000 per violation as provided for in the Act.

257.    Additionally, pursuant to California Civil Code sections 1788.30 and 1788.17, Plaintiff is entitled to recover all attorneys' fees, costs, and expenses incurred in the bringing of this action.

## COUNT VIII
## UNJUST ENRICHMENT[25]
(On behalf of Plaintiff, The National Property Inspection Fee Class and The National Forced Placed Insurance Class Against BOA)

258.    Plaintiff repeats and realleges paragraphs 1 through 154 as if fully stated herein.

259.    Plaintiff brings this cause of action on behalf of himself and the members of the National Forced Placed Insurance Class and National Property Inspection Fee Class.

---

[25] Plaintiff pleads her unjust enrichment claim against BOA in the alternative to his contractual claims against them.

260.    BOA received benefits from Plaintiff and Class members in the form of unwarranted kickbacks, including "expense reimbursements" or "commissions," captive reinsurance arrangements, and subsidized loan servicing costs for its forced-placed insurance scheme.

261.    BOA entered into an agreement whereby the insurance vendor – here, Integon – would provide below cost mortgage servicing activities and cover BOA's entire portfolio of loans with a master policy and issue certificates of insurance when a borrower's voluntary policy lapsed. BOA would then charge Plaintiff and the Class amounts for the forced-placed insurance that had been artificially inflated to include the kickbacks described above and then retain the amounts of those kickbacks for itself. The force-placed policies imposed on borrowers therefore cost less than what BOA actually paid for them.

262.    Integon paid and collected significant monies in kickbacks, commissions, reimbursements, and reinsurance tied directly to the cost of the force-placed insurance premium (as a percentage). Commissions or kickbacks were paid directly to BOA or its affiliates in order to be able to exclusively provide force-placed insurance policies. Integon was a mere conduit for the delivery of the kickbacks and improper charges to BOA or its affiliates.

263.    These payments directly benefitted BOA and/or its affiliates and were taken to the detriment of the borrower. The kickbacks (in the form reimbursements, commissions, or reinsurance arrangements, as well as subsidized costs) were subsumed into the charges to borrowers for the forced-placed insurance and ultimately paid by them. Therefore, BOA had the incentive to charge and collect unreasonably inflated prices for the forced-placed policies.

264.    Further, BOA was unjustly enriched through financial benefits in the form of increased interest income and other fees that resulted when the amounts for the forced-placed insurance policies

were added to the Class members' mortgage loans and through duplicative insurance based upon the Lender Loss Payable Endorsement or the Standard Mortgage Clause.

265.    Additionally, BOA received benefits in the form of added loan balances, interest and other charges for its charges to Plaintiff and the Class Members for improper and unnecessary property inspection fees.

266.    BOA improperly charged unnecessary property inspection fees to Plaintiff and the Class members at an inflated price and earned money and fees that were unreasonable.

267.    As a result, Plaintiff and the Class Members have conferred a benefit on BOA.

268.    BOA had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on it.

269.    BOA will be unjustly enriched if it is allowed to retain the aforementioned benefits, and each Class member is entitled to recover the amount by which BOA was unjustly enriched at his or her expense.

270.    Plaintiff, on behalf of himself and all similarly situated Class members, demand an award against BOA in the amounts by which it has been unjustly enriched at Plaintiff's and the Class Members' expense, and such other relief as this Court deems just and proper.

**COUNT IX**
**VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Pro. Code §17200, *et seq*.**
(On behalf of Plaintiff, and The California Forced Placed Insurance Class and the California Property Inspection Fee Class Against BOA)

271.    Plaintiff repeats and realleges paragraphs 1 through 154 as if fully stated herein.

272.    Plaintiff brings this cause of action on behalf of himself and the members of the California Forced Placed Insurance Class and California Property Inspection Fee Class.

273.    The California Unfair Competition Law ("UCL") prohibits any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.

274.    The UCL imposes strict liability.  Plaintiff and the Members of the Classes need not prove that Defendants intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices – but only that such practices occurred.

275.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

276.    Each defendant is a "person" as defined by Cal. Bus. & Pro. Code §17201.

277.    BOA's actions constitute "unfair" business practices because, as alleged above, BOA used false, deceptive, confusing and misleading statements, and failed to disclose and/or omitted material facts, concerning the propriety of certain fees and services that were automatically ordered and charged to the Members of the California Subclasses as well as the fraudulent and self-dealing nature of BOA's business relationship with Integon.  BOA's acts and practices offended an established public policy, and engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

278.    Specifically, BOA individually and collectively with its affiliates led consumers to believe that certain distressed mortgage loan fees including but not limited to, forced-placed insurance policies  fees for property inspections and other services, were authorized by their mortgage documents and appropriately priced when, in reality, the fees were inflated due to BOA's self-dealing business relationship with Integon and other affiliates and were for services that were unauthorized, duplicative, provided no benefit to the consumer, and/or were never performed.

279.    BOA's false, deceptive, confusing and misleading statements and omissions are likely to mislead consumers into believing that BOA's Property Inspection Fees and Forced-Placed Insurance Fees are appropriately priced and/or authorized when, in fact, they are not.

280.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

281.    BOA's acts and practices alleged above constitute fraudulent business acts or practices as they have deceived Plaintiff and the Members of the California Subclasses, members of the consuming public.  Plaintiff and the Members of the California Subclasses relied on Defendants' fraudulent and deceptive representations that certain distressed mortgage loan fees including but not limited to, forced-placed insurance policies fees for property inspections and other services, were authorized by their mortgage documents and appropriately priced.

282.    Further, a business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

283.    BOA's acts and practices alleged above constitute unlawful business acts or practices as they have violated state and federal law as described herein.

284.    BOA's practices, as set forth above, have misled Plaintiff and the Members of the California Subclasses in the past and will continue to mislead in the future.  Consequently, BOA's practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

285.    Defendants' acts and omissions alleged herein violate the UCL, including BOA's violations of the FDCPA and RFDCPA.

286.     As a direct and proximate result of defendants' unlawful and unfair business practices, Plaintiff and the Members of the California Subclasses have suffered injury in fact and have lost money or property as a result of Defendants' violation of the UCL.

287.     BOA's failure to abide by the laws discussed herein provide them an unfair advantage over their competitors at the expense Plaintiff and the Members of the California Subclasses.  The actions of BOA thereby constitute an unfair, fraudulent, and/or unlawful business practice under Business & Professions Code §17200, *et seq.*

288.     Plaintiff and the Members of the California Subclasses bring this cause of action seeking equitable and injunctive relief to stop Defendants' willful and ongoing misconduct, and to seek restitution of the amounts Defendants acquired through the unfair, unlawful, and fraudulent business practices described herein.  In addition, Plaintiff and the Members of the California Subclasses seek an award of costs and attorneys' fees pursuant to California Code of Civil Procedure §1021.

## IX.

## JURY DEMAND

289.     Plaintiff respectfully requests a trial by jury on all issues so triable.

## X.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Classes, respectfully requests this Court to award against Defendants in favor of Plaintiff and the Class all of the following:

a.     Certifying Plaintiff's claims for class treatment under Federal Rules of Civil Procedure 23, appointing Plaintiff as Class Representative, and appointing Plaintiff's attorneys as counsel for the Classes;

b.  For an order awarding compensatory damages on behalf of Plaintiff and the Classes in an amount to be proven at trial;

c.  For judgment for Plaintiff and the Classes on their claims in an amount to be proven at trial, for compensatory damages caused by Defendants' unfair or deceptive practices, for treble damages, and for exemplary damages to each Class member for each violation;

d.  For an order enjoining BOA and Integon from continuing their unfair, unlawful, and/or deceptive practices, and any other injunctive relief as may appear necessary and appropriate;

e.  For judgment for Plaintiff and the Classes on their federal and state law claims, in an amount to be proven at trial;

f.  Restitution, civil penalties and damages as allowed under the Unfair Competition Law;

g.  For restitution of all improperly collected charges and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Plaintiff and members of the Classes;

h.  For an accounting of all credits, disbursements and charges and other benefits associated with Plaintiff's and Class Members' real estate transactions;

i.  For pre-judgment and post-judgment interest as provided for by law or allowed in equity;

j.  For an order awarding Plaintiff and the Classes their attorneys' fees and costs; and

k.  Any other relief for Plaintiff and the Class the Court deems just and proper.

Dated:   October 29, 2021                      Respectfully submitted,

                                               **GUSTAFSON GLUEK, PLLC**

                                  By:    _/s/ Dennis J. Stewart_
                                         Dennis J. Stewart,
                                         CA Bar No. 99152
                                         600 B Street, Suite 1700
                                         San Diego, CA 92024
                                         Tel.: (612) 333-8844
                                         Fax: (612) 339-6622
                                         dstewart@gustafsongluek.com